**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**F. W. WOOLWORTH CO., Respondent.**
**No. 14577.**

United States Court of Appeals
Ninth Circuit.
June 25, 1956.

David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frederick U. Reel, Edward D. Friedman, Attys., N.L.R.B., Washington, D. C., Daniel J. Harrington, Atty., N. L. R. B., Los Angeles, Cal., for petitioner.

Davies, Hardy & Schenck, Christopher W. Hoey, New York City, George O. Bahrs, San Francisco, Cal., for respondent.

Before STEPHENS, FEE and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

Herein we have a question of whether the Woolworth Company must furnish certain payroll information to a representative of a clerk's union (hereafter called "local"), the collective bargaining agent for the employees of the company's store at San Bernardino, Calif.

The demand was for names, hours and wages of employees over a period immediately preceding the demand. The Woolworth Company refused and refuses to supply the requested information other than names of employees and initial classification.

The Labor Board has found an unfair labor practice and petitions here for the usual enforcement order.

Before setting forth the details of the controversy, we think it advisable to set forth hereafter as an appendix the entire wage agreement which is at the root of the succeeding events in the labor-management dispute. The agreement appears as appendix "A".

It will be noted in Section 21 that the two year agreement provided for a cost-of-living adjustment on March 7, 1953, or the basic minimum wage rate as contained in Section 5. Also in Section 21 one observes a provision for further adjustment by "mutual agreement between the parties." The management prerogative clause, Section 17, should be carefully read.

There appears to be no contention that management will not furnish the local the names of all employees on the payroll. Such information seems to have been made available to the satisfaction of the local.

But shortly after execution of the contract, the local wrote for the number of hours worked per week for each employee, also each employee's total pay and rate of pay for the week ending prior to the effective date of the agreement, which was March 5, 1952. The request was ignored.

Early in 1953, negotiations began for revision of the basic rates. One and $^{42}/_{100}$ths cents per hour was required automatically on the standard of living index. The local asked for five cents. The company was offering two and one-half cents. During the negotiations the request was revived for the same wage information previously requested. It was urged that the information was needed "for the intelligent and equitable administration of the agreement." Later, during the negotiations the demand was repeated.

On April 30, 1953, the local accepted the company's offer of two and one-half cents or one dollar per week increase on

the basic wage rates. On May 5, the local again wrote the company for the information. The request was refused by ignoring it. On June 18, the local filed a complaint with the board alleging the refusal was an unfair labor practice. After a hearing, the board agreed.[1]

We believe that the company really makes three defenses: 1. An employer never has to give such information as was demanded here. 2. If in some cases such information must be furnished, it was not obligated to do so here. 3. The matter should have been submitted to arbitration.

In connection with contention (2), the company relies heavily on the management prerogative clause, Section 17 of the contract.

In view of our conclusion on the second contention, we do not reach squarely the first contention, but of course the arguments on either contention do overlap. In ruling on contention (2), we think much depends on how we read the recent case of N. L. R. B. v. Truitt Manufacturing Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. ——.

The facts of Woolworth are different. In Truitt the information sought was the company's financial condition. Bargaining was deadlocked. The company said it couldn't afford the union's wage demands. The union said, "Prove it." The Supreme Court held, under the circumstances, information of the company ordinarily private, had to be supplied. The majority opinion makes clear that the right is not a universal one and depends on each case's peculiar circumstances. What the "circumstances" are will have to be hammered out in successive cases before the Labor Board and the Courts of Appeal with further delineation eventually by the Supreme Court when the cases are "ripe" or conflicts in circuits become serious.

There are a number of cogent arguments that the employee should have a right of privacy on payroll information, absent his consent to disclosure. With his consent, it probably would always be the employer's duty to furnish the union information, unless the totality of the information was so voluminous as to be unduly burdensome to prepare and would serve no possible useful purpose.

1. See 29 U.S.C.A. § 158. The specific provisions of the section held to be violated were:
"§ 158. Unfair labor practices
"(a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *
"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title. * * *"
29 U.S.C.A. § 157 is as follows:
"§ 157. Right of employees as to organization, collective bargaining, etc.
"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title."
29 U.S.C.A. § 159(a) is as follows:
"§ 159. Representatives and elections
—(a) Exclusive representatives; employees' adjustment of grievances directly with employer
"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further,* That the bargaining representative has been given opportunity to be present at such adjustment."

But here we have the question of the employee's representative, the local, by virtue of being the representative, and not because of any contract provision or any express authorization from those whom it represents, demanding the information. Woolworth contends that the board has here enunciated a "per se" right. We do not think the board intended to go that far, but its holding approaches it.

For the purposes of this opinion, we shall assume that in the posture of some negotiations with the employer concerning contracts and wages, the bargaining representative by virtue of his office may be entitled to the information requested and to receive it from the employer.

Here we reject the board's findings and conclusions on the ground we do not find a rational basis for them. During the 1953 negotiations, the sole subject of negotiation was wholly under Section 21 of the contract and concerned an adjustment of Section 5 basic rates. That was the only thing to negotiate about at the time. There seems to have been no contention that Woolworth could not pay the basic rate demanded by the union and still survive. The relevancy of the demand with reference to the wage increase negotiations was at no time demonstrated. It is agreed that at the time an employee began work the local was notified of the employment and of the employee's classification according to experience under Section 5. The contract, Section 17, gave management exclusive and absolute control over any incentive or bonus pay schedules. The amount of overtime work, if any, was obviously reserved to the employer.

But what of the demand made by the employee representative after the wage increase was satisfactorily concluded? The only ground ever expressly asserted was: "It is imperative that we have this information for the intelligent and equitable administration of the Agreement."

We do not hold that a request must painfully, laboriously or absolutely demonstrate in detail a relevancy, but we do believe that at sometime or someplace some specific relevancy should be asserted or facts should be shown whereby one could say that the employer ought to know anyway without demonstration the relevancy of the information to the relationship of the parties. It must be something more than Micawber's "something may turn up."

Later, the secretary of the local testified generally before the board as to a number of complaints that the local had had to adjust with management during the term of the contract from its execution forward. We find the nature of these complaints most elusive. The representative never suggests a type of grievance requiring the information. Further, it is interesting to note that this representative demanding the information had no idea whether his local office was keeping the classified detailed information supplied by the company upon the occasion of each new addition to the payroll.

Assuming the right to complete payroll information under some circumstances for purposes of "intelligent administration" of the agreement, it perhaps could be that a bona fide assertion that a substantial number of employees were not getting their minimum rates would justify a request for payroll information on all of the employees. Moreover, poor observance in general by management of the terms of an agreement might justify a request for payroll information to see if wage contract provisions were being flouted. But the board was told nothing of the employee grievances which the representative said he had for his attention. Further, the representative had no idea whether the serious grievances (character unknown) had been adjusted. Objectively the local request does not seem to meet a test of reasonable usefulness, and there is no showing of anything in the subjective minds of the parties indicating need.

We cannot believe that if any serious violations of an agreement are going on that they will customarily remain wholly unknown. There will ordinarily be the necessary inkling and evidence to justify

the request for specific information as to a specific individual and the grounds suggesting an immediate need for information for all also will rear themselves.

Our appraisal of this record is that the claim of unfair practice, when closely analyzed, condenses to no more than, "Well, we might find something." If we are correct in that analysis of the nature of the claim, then we are confident of our conclusion that there was no unfair labor practice.

If the complainant is entitled to information highly personal to employees, we think the lesson is in N. L. R. B. v. Truitt Manufacturing Co., supra, and in N. L. R. B. v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027, that there must under all of the circumstances be a showing of reasonable need of the information to meet a condition. If the reason is not obvious, then he who asserts the claim should demonstrate to him against whom it is asserted some relevant particularity.

We do hold that the information does not have to be produced on a "Well, we want it" or "It is a handy thing to have around" basis.

The contention of Woolworth that here was a dispute subject to arbitration, we find to be without merit.

The petition for enforcement will be denied. The board's order must be set aside.

Appendix "A"

"Agreement"

"This Agreement, made and entered into this 11th day of March, 1952, by and between the F. W. Woolworth Co. Store No. 433—San Bernardino, California, hereinafter referred to as the Employer and Retail Clerks' Union, Local 1167, AFL, affiliated with the Retail Clerks' International Association, hereinafter referred to as the Union.

"Witnesseth:

"The Employer and the Union agree as follows:

"Section 1. Recognition and Jurisdiction. The employer recognizes the Union as the sole collective bargaining agency for all employees except and excluding the manager, assistant manager, learner, fountain manager, fountain trainee, personnel supervisor, office supervisor, stockroom supervisor, floor supervisors, and all other supervisors as defined in the Act.

"Section 2. Union Membership. The Employer may select and employ without restriction; however, all new employees who are covered by this agreement shall become members of the Union within thirty-one (31) days from hiring in date. All employees covered by this Agreement who are now members or who become members of the Union shall maintain membership in the Union as a condition of continued employment, subject to the provisions of the Labor-Management Relations Act, 1947.

"Section 3. Discrimination. There shall be no discrimination against any employee because of membership or nonmembership in the Union.

"Section 4. Employee Work Week. The straight time work week shall consist of five (5) days of not more than seven (7) hours and fifteen (15) minutes each and one-half (½) day of not more than (4) hours. The overtime rate of pay shall be one and one-half (1½) times the employee's straight time rate of pay and shall apply:

"(a) For all work in excess of seven (7) hours and fifteen (15) minutes in any one day.

"(b) For all work in excess of four (4) hours on employee's half-day. The short day a. m. shift shall be completed by 2:00 p. m. The short day p. m. shift shall be started not earlier than 1:00 p. m.

"(c) For all work in excess of forty (40) hours in any one week, except that for a total of four (4) weeks in a calendar year the Employer may work employees on a six (6) day, forty-eight (48) hour straight time work week, with the overtime rate of pay applying after eight (8) hours in any one day and forty-eight (48) hours in any one week.

"Section 5. Wages. (a) The basic minimum wage rates for male and female employees shall not be less than: 1st 1040

hours' comparable experience: $.80 per hour; 2nd 1040 hours' comparable experience: $.875 per hour; Thereafter: $.95 per hour.

"(b) Except that enrolled students may be employed at: 1st 1040 hours' comparable experience: $.70 per hour; 2nd 1040 hours' comparable experience: $.75 per hour; Thereafter: $.80 per hour.

"(c) No employee shall suffer a reduction in wage rate on account of the signing of this agreement.

"(d) Employees working less than the full straight time work week shall receive an hourly rate of pay based upon the classification in which they fall, by taking into consideration the experience of the individual employee.

"Section 6. Regular Employee. Any employee working sixty (60%) per cent or more of the straight time work week and who has been in the continuous service of the Employer for at least 520 hours shall be considered a regular employee. A total lapse of service of sixty (60) work days or less per calendar year shall not break continuity of service for the purpose of this agreement.

"Section 7. Holidays. (a) Regular employees shall be allowed the following holidays without any deduction in pay, providing, they work the normal work days preceding and following the holidays, or if absence is with express permission of the Employer or due to bona-fide illness: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, and Christmas Day. All work performed by regular employees on any of the above holidays shall be compensated for at double time, same to include holiday pay. When any of said holidays fall on a Sunday the following Monday shall be considered the holiday for the purpose of this provision.

"(b) Four and one-half (4½) days shall constitute a normal straight time work week for regular full-time employees in any week in which a recognized holiday falls. However, in the case of such employees whose scheduled short day falls on a recognized holiday they may be required to work the other five days in such week without payment of overtime, provided they are allowed a compensating short day without loss of pay in the week preceding or the week following such holiday.

"Section 8. Vacations. (a) Regular employees shall be entitled to vacation with pay on the following basis: After six (6) months' continuous service—one (1) week; After one (1) year's continuous service—two (2) weeks; After five (5) years' continuous service—three (3) weeks.

"(b) No employee shall be entitled to more than two (2) weeks' vacation within a calendar year until after having completed five (5) full years of service.

"(c) The Employer shall arrange vacation dates, giving due consideration to employee's length of service.

"(d) The vacation period shall be from May 1st to October 1st, or at other times at the discretion of the Employer.

"(e) When a holiday as provided in this agreement falls within an employee's paid vacation, such employee shall receive an additional day's vacation with pay or pay in lieu thereof at the option of the Employer.

"(f) After six (6) months' continuous service any regular employee who resigns or is laid off shall receive accrued vacation pay in accordance with the above provisions.

"Section 9. Rest Periods. The Employer shall authorize employees to take rest periods on the following basis:

"When the employees work more than two (2) hours and up to six (6) hours in a day they shall be entitled to ten (10) minutes' rest time without loss of pay.

"When employees work more than six (6) hours in a day they shall be entitled to twenty (20) minutes' rest period time without loss of pay.

"The Employer shall set the time for rest periods.

"Section 10. Leaves of Absence. Leaves of absence shall be granted at the

discretion of the Employer. Applications for and the granting of leaves of absence shall be in writing, with departure and return dates specified.

"Section 11. Uniforms. Where the Employer requires the employees to wear uniforms or aprons the Employer shall furnish same and pay for the laundering or cleaning.

"Section 12. Contributions. All contributions to charity shall be voluntary.

"Section 13. Layoffs and Rehires. When merit and ability are equal, length of service shall be recognized when it is necessary to lay off or rehire regular employees.

"Section 14. Meal Periods. No employee shall be required to work more than five (5) consecutive hours after reporting for work without an uninterrupted meal period of not less than thirty (30) minutes and not more than sixty (60) minutes.

"Section 15. No sales or office employees shall be required to do heavy janitorial work.

"Section 16. Cooperation. Any privileges or benefits not contrary to company policy now being enjoyed by the employees, shall be continued and, in consideration therefor, the Union shall encourage its members to give prompt and courteous service to customers and the Union shall urge its members to use proper care in handling wrapping materials, merchandise, and equipment to prevent damage, soilage, or any loss to the store.

"Section 17. Management Functions. The management of the store and the direction of the store personnel, including but not limited to, the right to hire, suspend, layoff, dismiss, discipline, transfer, promote, or the establishment of working schedules, training methods and the assignment of employees to jobs, to adopt or remove incentive or bonus systems, to adjust wage rates above those contained in this agreement, and other management functions not specifically mentioned herein, are exclusive responsibilities of the Employer.

"Section 18. Cause for Discharge. The Employer may discharge any employee for dishonesty, unseemly conduct, insubordination, incompetency, neglect of duty, failure to perform work as required, and for not observing posted rules. The Employer shall be the sole judge of the competency and efficiency of all employees, and the continuity of employment shall be based entirely upon the Employer's judgment of the merit and ability of the individual employee. A discharged employee shall be entitled to a fair hearing on request.

"Section 19. Disputes. When a dispute arises as to the correct interpretation or application of any provision of this agreement, it shall be referred to a representative of the Union and the store manager. These two, after investigation, shall attempt to settle such disputes. In the event these two cannot agree, they shall jointly request the Federal Mediation and Conciliation Service to submit a panel of five (5) arbiters, one of which shall be selected by the process of elimination. Then the dispute shall be reduced to writing and submitted to the arbiter who shall decide the matter. The decision of the arbiter, within the scope of the submission, shall be final and binding on the parties hereto. The expense of any proceeding provided for herein shall be borne equally by the Employer and the Union.

"Section 20. No Lockouts, No Strikes. There shall be no lockouts, no work stoppages, no strikes affecting the employees covered by this agreement.

"Section 21. Term of Agreement. (a) All terms and conditions of this agreement shall become effective the first Saturday following date of signing and shall remain in full force and effect to and including March 5, 1954, except as hereinafter provided.

"(b) Cost-of-Living Adjustment—On March 7, 1953, the basic minimum wage rates only as contained in Section 5, subsections (a) and (b) of this agreement shall be adjusted percentagewise to at least the per cent of change in the Na-

tional BLS Index during the period of February 1, 1952 and February 1, 1953.

"Example: Assume that the "new" Consumers Price Index of the Bureau of Labor Statistics increases five per cent (5%) in the specified period the said hourly rates of pay shall be increased no less than five per cent (5%). A larger adjustment in the hourly rates may be made by mutual agreement between the parties.

"This contract supersedes any and all agreements, oral or written, heretofore entered into between the parties, except the transmittal letter accompanying this document.

"For the Employer:
                "/s/ E. F. Peck,
                    "Store Manager.
"For the Union:
                "/s/ Ted Phillips,
                "Sec.-Treas. Local 1167."