**J. I. CASE COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 12098.

United States Court of Appeals
Seventh Circuit.

March 12, 1958.

O. S. Hoebreckx and Robertson, Hoebreckx & Davis, Milwaukee, Wis., for petitioner.

Harold A. Katz, Chicago, Ill., for intervener.

Stephen Leonard, Associate Gen. Counsel, Frederick U. Reel, Jerome D. Fenton, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Attys., Na-

tional Labor Relations Board, Washington, D. C., for respondent.

Before DUFFY, Chief Judge, and HASTINGS and PARKINSON, Circuit Judges.

HASTINGS, Circuit Judge.

The J. I. Case Company petitions this court pursuant to Section 10(f) of the National Labor Relations Act (the Act), as amended, 29 U.S.C.A. § 160(f), to set aside an order of the National Labor Relations Board, reported in 118 N.L.R.B. 56, requiring that company to cease and desist from refusing to bargain collectively by declining to furnish the certified bargaining representative of its employees [1] at its Bettendorf and Rock Island plants certain information and wage rate data concerning time studies and job evaluation. The Board, in its answer, has requested enforcement of its order pursuant to Section 10(e) of the Act.

The collective bargaining agreement in effect at all times material to this petition at the Company's Bettendorf plant was executed on January 27, 1956 and was to continue in force for two years. It was reopenable as to wages on January 30, 1957 upon sixty days written notice. Two sets of wage rates were set up under the contract: Schedule A rates were hourly rates and Schedule B rates were applicable to piece rate or incentive workers. It was provided that the company would establish piece prices by time study or other appropriate methods. "Classification rates" at ten percent higher than guaranteed minimum piece rates were to be in effect until piece rates were set. Further provision was made for review of a piece price in the event of a significant change in the nature of a job. The contract provided for the usual grievance procedure, specified that "[c]omplaints regarding piecework prices may be handled in accordance with the grievance procedure", and indicated that the agreement should be interpreted as disposing "of any and all issues subject to collective bargaining, except with respect to grievances * * *."

The Company had furnished the Union a summary of all jobs at the Bettendorf plant including the "vertical turret lathe" job which was indicated to be a single machine operation. After the execution of the bargaining agreement, the Company changed the job to a two machine operation but did not change the rate of pay. The Union made a formal request in writing on March 26, 1956 asking for certain data relevant to the job, including the time studies on the job as a two machine and as a one machine operation and the various criteria the Company used in setting up a job evaluation for the two machine job. The request from the Union suggested "that the information include what weight is given each factor used to arrive at a final decision on the established rate and what factors are considered in making such a decision." The Union stated in this letter that the information was needed before further discussion was possible.

There was no written reply to the Union's formal request, but, at the next regularly scheduled meeting between the Plant Grievance Committee and Company representatives, the superintendent in charge of the department making time studies, made an oral presentation of the time study information on the two machine and one machine jobs, and diagrammed the operation on a blackboard. The Company refused to give the time studies to the Union so that its time study experts could examine them. It also re-

---

1. Local 806 of the International Union Automobile & Agricultural Implement Workers of America, AFL–CIO was certified as the exclusive bargaining representative of the employees at the Rock Island plant of the Company in 1946 and has been recognized by the Company as such since that date. At the Company's Bettendorf works, the parent International Union has been, since 1953, the certified bargaining representative of the employees. In this opinion the term "the Union" will be used to refer to whichever bargaining representative is appropriate in the context.

fused to supply the other data requested. The Union indicated its dissatisfaction with the information and some time later submitted a written request, pursuant to terms of the agreement, to negotiate a new rate for the job.

On March 28, 1956, the Union made a further request of the Company for information needed "for purposes of collective bargaining and contract administration * * *." This request was for "all data and time study information and material used in setting the incentive rates which are currently in effect for all jobs in the UAW Bargaining Unit at the Bettendorf works * * *", and for "all data, studies, and other information which is used to determine the value of each job currently listed in Schedules A and B * * *", as well as such data used in determining the respective labor grade for each job. The Company refused to supply this data, stating that since no negotiations were in progress, it was not obligated to do so.

The collective bargaining contract in effect at the Company's Rock Island plant was a two year agreement entered into on January 20, 1955. It was similar to the agreement at the Bettendorf works of the Company. The contract could be reopened after September 1, 1955 by either party, upon thirty days written notice, for negotiations on wage rates. The required written notice had to "set forth specifically the adjustments desired." The agreement contained provision for the usual grievance procedure and wage provisions, including a method for establishing piecework rates and a complete schedule of rates for the various labor classifications.

Some dissatisfaction arose among the Rock Island plant's tractor assembly employees over the failure of the company to announce piece rates. After these rates for the tractor line had been announced pursuant to a company time study, this dissatisfaction continued, and, on March 15, 1956, at a regular grievance meeting between the company representatives and the Bargaining Committee of the Union, the Union requested that the Company make available the time study data for the tractor line jobs. The Union repeated its request in writing on April 5, stating that it needed the time studies requested to "arrive at an answer as to whether there was a legitimate complaint or not." The Company, without explanation, refused to make these time studies available.

Unfair labor practice charges were filed with the Board by the International Union against the Company. The Trial Examiner found violations of Section 8 (a)(5) and (1) of the Act in the Company's refusal of the March 15 and March 26 requests but found no violation in the refusal of the broad request made on March 28 for "all data and time study information" for "all jobs" in the bargaining unit at the Bettendorf works because such request was unduly burdensome and because the information so requested exceeded any need by the Union, existing or prospective. The Board, upon the undisputed facts presented, sustained the holding that the refusals to supply the data requested on March 15 and 26 were in violation of the Company's statutory bargaining obligations but found, in addition, that the refusal of the March 28 request was also a violation of the provisions of the Act.

 Although the particular circumstances in each case must be considered in determining whether or not the statutory obligation to bargain in good faith has been met (N.L.R.B. v. Truitt Mfg. Co., 1956, 351 U.S. 149, 153, 76 S.Ct. 753, 100 L.Ed. 1027), there are numerous decisions to the effect that a refusal by an employer to supply *pertinent* and *relevant* wage data concerning wage rates of the employees is a violation of the obligation to bargain in good faith. N.L.R.B. v. F. W. Woolworth Co., 1956, 352 U.S. 938, 77 S.Ct. 261, 1 L.Ed.2d 235, reversing 9 Cir., 1956, 235 F.2d 319; Taylor Forge & Pipe Co. v. N.L.R.B., 1956, 7 Cir., 234 F.2d 227; certiorari denied, 1956, 352 U.S. 942, 77 S.Ct. 265, 1 L.Ed.2d 238; Boston Herald-Traveler Corp. v. N.L.R.B., 1955, 1 Cir., 223 F.2d 58; N.L.R.B. v. Item Company, 1955, 5

Cir., 220 F.2d 956; N.L.R.B. v. Whitin Machine Works, 1954, 4 Cir., 217 F.2d 593; N.L.R.B. v. Otis Elevator Co., 1953, 2 Cir., 208 F.2d 176.

The Company contends that, in light of the circumstances in this case, it fulfilled its statutory duty to bargain. It urges that it had no obligation to furnish the desired information because the Union's requests for data were not made in good faith for purposes of collective bargaining; the requested data pertained neither to a pending grievance nor to a request for negotiation under the contract; the production of the data would have been unwarrantedly burdensome since the Company did offer to supply some of the information orally; and, finally, the requested data had not been relied upon by the Company during negotiations with the Union but was used for internal management purposes only.

■ If, as the Company contends, the Union's requests, in each instance, were not made in good faith for the purpose of collective bargaining, the refusal to supply the data would not have been a violation of the Act. Boston Herald-Traveler Corp. v. N.L.R.B., 1955, 1 Cir., 223 F.2d 58, 63; Superior Engraving Co. v. N.L.R.B., 1950, 7 Cir., 183 F.2d 783, 794. The Board has never disputed this but urges that, on the record in this case, the Union's requests were made in good faith. Cf. Utica Observer Dispatch v. N.L.R.B., 1956, 2 Cir., 229 F.2d 575, 577. In this connection, the Company failed in its attempt to prove a series of groundless requests for data all purportedly part of a general scheme of harassment by the Union. There was also little to bolster the Company's claim that the Union indulged in the filing of groundless charges with the Board.

■ Putting aside the matter of the good faith of the Union in previous dealings with the Company, the question of whether the Union's requests *in this case* were made in good faith turns, as the Board indicates, on a determination of the relevance of the information to the Union's task as the bargaining repre-

sentative. The Board urges that, in each instance, the data requested was required by the Union in the administration and policing of the collective bargaining agreements in force at the two plants here involved. The Company takes issue with the Board on this latter point and in so doing raises basic questions as to the nature of collective bargaining. The petitioner contends that the statutory duty to bargain in good faith is pegged to the existence of pending wage negotiations without which there is no obligation to bargain. It urges further that under its contracts with the Union all complaints regarding piecework prices must be handled by grievance procedures and that no grievances were filed in the instant situations.

■ These contentions stem from a basic disagreement between petitioner and the Board as to the proper conception of the Union's role as representative of the employees and of the very nature of the collective bargaining process. The contention that the Union's right to data is limited to pending wage negotiations overlooks the fact that *collective bargaining is a continuing process* which, "[a]mong other things, * * * involves day to day adjustments in the contract and other working rules, resolution of new problems not covered by existing agreements, and the protection of employee rights already secured by contract." Conley v. Gibson, 1957, 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80. See also Aeronautical Industrial District Lodge 727 v. Campbell, 1949, 337 U.S. 521, 525, 69 S.Ct. 1287, 93 L.Ed. 1513. A collective bargaining agreement thus provides "the framework within which the process of collective bargaining may be carried on." Timken Roller Bearing Co. v. N. L. R. B., 1947, 1 Cir., 161 F.2d 949, 955. The Union not only has the duty to negotiate collective bargaining agreements but also the statutory obligation to police and administer the existing agreements. The provision in the Bettendorf contract that the agreement "disposes of any and all issues subject to collective bargaining, except with re-

spect to grievances \* \* \*" does nothing more than foreclose the Union from bargaining during the life of the contract about matters not covered therein. This clause does not affect the Union's right and duty to administer the contract.

There is no language in the contracts here involved which, under the circumstances, could be considered a waiver of the Union's right to receive the requested information. Cf. International News Service Division of the Hearst Corp., 113 N.L.R.B. 1067, 1070 where the Board held that there must be a clear and unmistakable showing that such a waiver occurred. Further, the Board has indicated that the statutory obligation to furnish data to the bargaining representative "is not satisfied by a substitution of the grievance procedure of the contract for [the employer's] obligation to furnish the Union with information it needed to perform its statutory function." Hekman Furniture Co., 101 N.L.R.B. 631, 632, enforced 6 Cir., 1951, 207 F.2d 561; Leland-Gifford Co., 95 N.L.R.B. 1306, 1322, enforced 1 Cir., 1952, 200 F.2d 620, 624.

The Board seeks support for its position in this case in the recent decision by the Supreme Court reversing the Court of Appeals for the Ninth Circuit in N.L.R.B. v. F. W. Woolworth Co., 9 Cir., 1956, 235 F.2d 319, and also in the decision of this court in Taylor Forge & Pipe Co. v. N.L.R.B., 7 Cir., 1956, 234 F.2d 227. In the Woolworth case, shortly after negotiation and execution of a collective bargaining contract, the Union requested certain wage information including the number of hours worked per week by each employee and also each employee's total pay and rate of pay. This request was ignored by the Company. The Board found this to be a violation of Section 8(a) (1) and (5) of the Act but the Court of Appeals denied the petition for enforcement. The Supreme Court without opinion summarily reversed that court's decision. N.L.R.B. v. Woolworth Co., 1956, 352 U.S. 938, 77 S.Ct. 261, 1 L.Ed.2d 235.

In many respects there is a close parallel between the Woolworth case and the instant case. The only ground for the request expressly asserted in Woolworth was that the information was needed for "intelligent and equitable administration of the Agreement." N.L.R.B. v. F. W. Woolworth Co., 9 Cir., 1956, 235 F.2d 319, 322. There was also some reference to complaints by employees giving rise to *potential grievances* and creating the need for the requested data. Ibid. The position taken by the company in the Woolworth case in refusing the data was in all material aspects identical to that of the petitioner in the instant case. The Court of Appeals for the Ninth Circuit after noting the language of the Supreme Court in N.L.R.B. v. Truitt Mfg. Co., 1956, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 to the effect that cases involving requests for data must each turn on their peculiar circumstances, proceeded to reject the Board's findings and conclusions as without any rational basis and ruled that the Union must in such cases show more clearly some proof of relevancy of the information requested to its role as bargaining representative.

Although the Supreme Court, in summarily reversing without opinion the Court of Appeals in the Woolworth case, gave little guide for the determination of related cases, its rejection of the Ninth Circuit's decision clearly indicates that more weight must be given the Board's findings on the question of the relevance of the information requested to the Union's statutory obligation to police and administer the agreement.

■ The Court of Appeals in the Woolworth case did recognize that the Board was not enunciating a "per se" right to information. Clearly, there is no such right of the Union to information. The Board certainly does not so contend, although, as the dissenting opinion of Mr. Justice Frankfurter in N.L.R.B. v. Truitt Mfg. Co., supra, 351 U.S. at page 156, 76 S.Ct. at page 757 indicated, the Board has increasingly tend-

ed to approach the "good faith" and disclosure question in an overly mechanical fashion.

The Board likens the circumstances involved in this present case to those in Taylor Forge & Pipe Co. v. N.L.R.B., supra. In that case the Union's request was made during bargaining negotiations and was for data on certain "point ratings" which the Company used in determining each employee's rate of pay. The information was refused. The Board concluded that the requested information was relevant and essential to the parties' bargaining, and the Board's decision was affirmed by this court.

█ The Company in the instant case attempts to distinguish the Taylor Forge case and several others cited in support of the Board's position on the ground that in each case bargaining negotiations were involved. Because of the continuing nature of the bargaining process this distinction is not controlling. The fact that negotiations are pending may be an important factor in considering the relevance of the requested data to Union bargaining needs, but it is not the sole consideration. The courts have recognized that the information the Unions are entitled to have from management "should not necessarily be limited to that which would be pertinent to a particular existing controversy." N.L.R.B. v. Whitin Machine Works, 4 Cir., 1954, 217 F.2d 593, 594, certiorari denied 349 U.S. 905, 75 S.Ct. 583, 99 L.Ed. 1242; specifically approved in N.L.R.B. v. Item Co., 5 Cir., 1955, 220 F.2d 956, 958, certiorari denied 350 U.S. 905, 76 S.Ct. 177, 100 L.Ed. 795, and in Boston Herald-Traveler Corp. v. N.L.R.B., 1 Cir., 1955, 223 F.2d 58, 62, 63.

██ We hold that the Board correctly found that each request by the Union was made in good faith for data directly related to the Union's functions as bargaining representative. The Union was interested in obtaining the time study data on the tractor line jobs at the Rock Island plant to determine whether or not there was any basis for employee complaints as to the piece rate for those jobs and, therefore, whether or not the Union should file or support a grievance with respect to the rates for the jobs. Similarly, the Union had a real interest in any time study or other data the Company relied upon in maintaining the same rate of pay on the turret lathe-vertical job at the Bettendorf plant after changing the job from a one to two machine operation. The Company did not satisfy its obligation by oral presentation of the complicated wage data during the regular meeting with the Plant Grievance Committee.

█ The much broader request of March 28 was likewise well founded. The time study data, job value information and labor grade data are all important considerations in the Company's wage structure. Taylor Forge & Pipe Co. v. N.L.R.B., supra, 234 F.2d at page 229. In this respect there is no merit in the Company's contention that the data requested was used for internal management purposes only. Also, it is not material whether the Company relied directly on this information in its negotiations with the Union. The Board's order requires only the production of data *used* in classifying or evaluating jobs or fixing rates of employees. As in the Taylor Forge case only with the requested information available would the Union be able " 'to know whether to press or modify a particular wage demand, whether inequities exist which merit discussion or correction, and whether other elements are present in the wage structure which, though impossible to visualize beforehand, appear to merit discussion once the full picture is available.' " Id. at page 230 of 234 F.2d. Finally, as the Board points out, *the Union* in this case *was actually preparing for contract negotiations* the following January to which this data would be relevant. The Board thus had sufficient basis for overruling the Trial Examiner's finding that production of the information requested would be unduly burdensome and exceeded any need by the Union, existing or prospective. The

facts were undisputed and no special weight attached to the Trial Examiner's conclusions in this respect. F.C.C. v. Allentown Broadcasting Corp., 1955, 349 U.S. 358, 364, 75 S.Ct. 855, 99 L.Ed. 1147; N.L.R.B. v. Chauffeurs, Teamsters, Warehousemen & Helpers Local Union No. 135, 7 Cir., 1954, 212 F.2d 216, 217. As already has been indicated the Union was entitled to this information for bargaining purposes. The fact that this case involved a large company using a complicated wage structure for a large number of employees does not lessen the Union's right to the information. The Union made suggestions for copying the information at its own expense which the Company did not accept. The greatest bulk of the information requested was the time study data. The Company did not even attempt to satisfy the Union request for information as to labor grade and job evaluation data for the some 250 jobs involved, which would not have been overly burdensome. It would seem that, before the hearing, the Company did not actually base its refusal of the Union requests on grounds that they were unduly burdensome. If it had, some arrangement could have possibly been made to lessen such "burden."

The parties have stipulated in this cause that, in the event this court upholds the finding of the Board that petitioners unlawfully withheld data from the bargaining representative of its employees, that the Board's order should nevertheless be amended:

"* * * (1) by substituting as Paragraphs 1(a) (2) and 2(a) (2) of the Order the following language in lieu of the language now contained in said paragraphs:

"In any like or related manner interfering with the efforts of the above-named labor organization to bargain collectively on behalf of the employees in the appropriate unit.

and (2) by substituting as the last paragraph of Appendices A and B the following language in lieu of the language now contained in said paragraphs:

"We will not in any like or related manner interfere with the efforts of the above-named labor organization to bargain collectively on behalf of the employees in the appropriate unit."

The order of the Board is amended pursuant to this stipulation. The petition to review and set aside the Board's order is denied and the Board's request for enforcement of its order as amended by stipulation is granted.