**NEW YORK MAILERS' UNION NUMBER SIX, INTERNATIONAL TYPOGRAPHICAL UNION, AFL-CIO, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Publishers' Association of New York City, Intervenor.**

**No. 55, Docket 27943.**

United States Court of Appeals Second Circuit.

Argued Oct. 25, 1963.

Decided Jan. 28, 1964.

Sidney Sugerman, New York City, for petitioner.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli and Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Glen M. Bendixsen, Attys., NLRB, for respondent.

Townley, Updike, Carter & Rodgers, New York City (John R. Schoemer, Jr., New York City, of counsel) for intervenor.

Before LUMBARD, Chief Judge, and WATERMAN and FRIENDLY, Circuit Judges.

WATERMAN, Circuit Judge:

This case is here upon a petition of the New York Mailers' Union Number Six, International Typographical Union, AFL-CIO, to review and set aside an order of the National Labor Relations Board issued on November 19, 1962, dismissing an unfair labor practice complaint against the Publishers' Association of New York City and ten of its members.[1] The Publishers' Association has intervened in connection with the petition. Jurisdiction of this court to entertain the petition is based on Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(e), the alleged unfair labor practice having occurred in

1. The petition has been brought pursuant to Section 10(f) of the National Labor Relations Act, 49 Stat. 455 (1935), as amended, 29 U.S.C.A. § 160(f).

New York City, within this judicial circuit.

The Publishers' Association of New York City is an unincorporated association representing a group of leading New York City newspapers.[2] The Association, on behalf of the publishers it represents, negotiates collective bargaining contracts with nine newspaper craft unions, including petitioner.[3] Each of the nine contracts negotiated with these unions covers the employees of a given craft at all the newspapers, and every contract is signed by the Association as well as by all the publishers.[4] During the period covering the relevant events in this case, all of the nine contracts contained provisions providing for final and binding arbitration of grievances and contract disputes, and several of them contained express no-strike clauses as well. In addition to negotiating these agreements the Association also participated in the handling of arbitration proceedings the contracts provided for. The relationship between all of the publishers and all of the unions is of long standing, and, as the Board noted, no anti-union animus in the ordinary sense is alleged or involved in this case.

Background evidence indicates that as early as 1950 the members of the Publishers' Association, plagued by work stoppages which they deemed to be contract violations, considered a "closing of ranks on the management side" to defend against such practices. It was not until 1958, however, that the publishers entered into the agreement which has been called into question in this case. Though the agreement was never incorporated into writing, it has been stipulated that the terms are fairly summarized in the following statement of the Executive Secretary of the Publishers' Association:

"In order to protect themselves from these wildcat activities by some of the unions, and in particular the newspaper and Mail Deliverers Union, the members of the association have reached an understanding which may be expressed as follows: In the event that any union that is a party to association-wide contracts engages in a work stoppage or threatens a work stoppage at the plant of any one of the publishers, the publisher involved will communicate the facts of the situation to each of the other members of the Association either directly or through the Association office.

"Each case will be considered on its individual merits but if the publishers operating at that time consider the conduct of the union to be a sufficiently serious violation of the association-wide contract and that the newspaper involved was justified or required to suspend operations, each of the other publishers will suspend operations until the matter is adjusted at the plant of the paper involved because of the union's breach of the association-wide contract."

The publishers' suspension agreement was consummated well before the Section 10(b) period in this case,[5] but it was re-

---

2. The newspapers represented by the Association during the relevant period in this case were The New York Times, The News, New York Post, Long Island Daily Press, Journal of Commerce, New York Herald Tribune, New York Journal-American, New York Mirror, New York World-Telegram and Sun, and Long Island Star-Journal.

3. These unions include Mailers' Union No. 6, International Typographical Union (Petitioner), the Deliverers (or Drivers), the Printing Pressmen, the Machinists, the Photoengravers, the Paper Handlers, the Stereotypers, the Electrical Workers, and the Typographers.

4. There is one union in the industry, the Newspaper Guild, with which the publishers bargain on an individual basis rather than through the Association.

5. Section 10(b) of the Act, 29 U.S.C.A. § 160(b), provides, in pertinent part: "[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *." The Section 10(b) date in this case is September 16, 1960.

affirmed and implemented on a number of occasions thereafter. The record indicates that, within the period covered by the complaint, resort was had to the agreement six times. Use of the agreement was four times threatened, and twice the agreement was actually implemented by the shutting down of publishing plants for brief periods. On the two occasions when shutdowns actually occurred no employee of any paper was told to leave the work premises and no employee lost any wages.

The circumstances surrounding the various resorts to the suspension agreement may be summarized briefly, beginning with the four occasions when plant shutdowns were only threatened. On January 15, 1961, during the course of a labor dispute at the Mirror, an official of that newspaper told the business agent of the Deliverers' Union that, in the event the union called a work stoppage at the Mirror, all the publishers in the City would shut down. On February 11, 1961, the stereotypers at the Herald Tribune engaged in a work stoppage because of a dispute between a company foreman and their union's "chapel chairman" over the assignment of a worker. After a Tribune official informed the Stereotypers' president that the stoppage was a contract violation and might result in a "city wide temporary suspension," the Stereotypers' president succeeded in getting work resumed. The third incident occurred on March 11, 1961, again at the Herald Tribune. The business agent of the Mailers' objected to the operation of a wire-tying machine without the use of certain safety devices, and he informed the company that failure to install the devices by the following afternoon would

result in a refusal by the mailers to operate the machine. A Tribune official contacted the president of the Mailers' and told him that a refusal by workmen to operate the machine "might lead to a city-wide shutdown by the Publishers." No strike was called, and the company's position that the machines were safely operable without the devices was sustained by the Labor Department. The final instance of a use of the agreement that fell short of an actual shutdown took place on May 2, 1961, at the Times, when that paper's general manager issued a memorandum to all employees setting forth the Times's understanding of the publishers' agreement in which it was indicated that the purpose of the agreement was to defend against work stoppages that violated a collective bargaining contract.[6]

Two actual shutdowns, both of a temporary nature and of brief duration, were engaged in by the publishers pursuant to their agreement. On February 23, 1961, a foreman at the Times discharged a deliverer for refusing to perform an assignment, and the other deliverers at the Times engaged in a sudden strike during a press run. The Times shut down operations at its 43rd Street plant and notified the Publishers' Association of its difficulties. Three members of the Association which, like the Times, published morning papers, were also notified. The three papers so notified were all between editions, and, upon receiving word of the dispute at the Times, all of them ordered their staffs not to resume printing until the strike at the Times had ended. Officials of the union involved were contacted, and, shortly after the suspension of operations by the other publishers, work

6. This memorandum was circulated about a week after the Times had been hit by a work stoppage on April 26, 1961, described in this opinion, infra. Since that work stoppage resulted in a brief city-wide shutdown by the publishers, the memorandum of May 2 was, apparently, circulated for the purpose of making clear to the Times's employees the policy underlying the shutdown which had occurred. If this was indeed the case, the circulation of the memorandum ought to be viewed not as a separate invocation of the suspension agreement but rather as part of the dispute which involved the work stoppage on April 26. However, since neither the Trial Examiner nor the Board made an explicit finding on the point (the Board indicating implementation of the suspension agreement "on five or six occasions") we shall treat the circulation of the memorandum on May 2 as a separate event.

was resumed at the Times. It appears that no edition of any paper was delayed for more than thirty minutes. No employee of any paper was told to leave the premises as a result of the shutdown and no employee lost wages.

The second incident which brought about an actual shutdown also occurred at the Times. On April 26, 1961, employees of the Times represented by the Typographers engaged in a walkout and work stoppage in protest of the discharge of their union's "chapel chairman." Of the three other morning papers notified of the dispute two continued most of their operations but both delayed their press runs until it became evident that the Times would be able to publish. The third paper was not ready to publish until the Times declared it was able to go to press. Because of the strike the first edition of the Times was delayed three hours and was reduced in size by 60 per cent. The following day, under threat of disciplinary action by their International Union, the Times's striking employees returned to work, and the discharge of the union "chapel chairman" was subsequently submitted to arbitration and found justified. As was the case with the other shutdown, no employee of any paper was told to leave the premises and no employee lost wages.

As a result of these incidents, unfair labor practice charges were lodged against each of the publishers and against the Association. The Trial Examiner who originally heard the case found that, though no violation of Section 8(a) (3) of the Act [7] had occurred, the publishers and the Association had violated Section 8(a) (1).[3] The Board, in a unanimous decision, disagreed with the Trial Examiner with respect to the claimed 8(a) (1) violation and dismissed the complaint in its entirety. The decision of the Board is reported at 139 NLRB 1092 (1962).

■ It is our view that the decision of the Board, which characterized the conduct of the publishers as legitimate defensive activity, should be permitted to stand. The facts and circumstances developed by the Board and Trial Examiner, never seriously questioned by any party, place this case within the rule announced by the Supreme Court in the Buffalo Linen case, N. L. R. B. v. Truck Drivers Local Union etc., 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957).

In Buffalo Linen, a union, bargaining with a number of employers on a group basis, called a strike against one of the employers during negotiations for a new contract. The non-struck employers, electing to regard a strike against one member of the multi-employer unit as a strike against all, responded by laying off their employees. The Supreme Court ultimately sustained the Board in its view that such employer conduct was lawful, the Court characterizing the issue before it as "whether a temporary lockout may lawfully be used as a defense to a union strike tactic which threatens the destruction of the employers' interest in bargaining on a group basis." 353 U.S. at 93, 77 S.Ct. at 646, 1 L.Ed.2d 676.

■ The employee threats and work stoppages, which prompted the employers in this case to threaten, and on two oc-

---

7. Section 8(a) (3), 29 U.S.C.A. § 158 (a) (3), provides that it shall be an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

8. Section 8(a) (1), 29 U.S.C.A. § 158(a) (1), makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." Section 7, 29 U.S.C.A. § 157, provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3) * * *."

casions actually to implement, industry-wide shutdowns, constituted threats to the interest each employer had in multi-employer bargaining. Common to the industry-wide contracts which these publishers had with each union was a clause providing for the final and binding arbitration of all grievances and contract disputes. Thus, under the rule of Local 174, Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), all the contracts bound the unions to refrain from striking over contract disputes and grievances during the lives of the contracts. Petitioner argues, however, that because some of the contracts contained express no-strike clauses the contracts in which the several unions agreed with the same parties to submit to final and binding arbitration should not be construed to contain no-strike promises by implication. There is no merit in this argument for, as the Board correctly noted, it is one which is wholly foreclosed by the Lucas Flour decision. In that case the union had struck over a dispute which was covered by a contract provision requiring final and binding arbitration. Another provision in the contract, dealing with disputes of a different type, included an express no-strike clause as well as an arbitration clause. The Court concluded that, despite the existence of an express no-strike clause in one section of the contract, a no-strike promise was also to be implied from the promise to submit disputes to final and binding arbitration. The rule announced in Lucas Flour goes beyond ordinary rules of contract construction; it is a rule of law that says a promise to resolve disputes through binding arbitration is a promise not to strike. As the Court there stated: "The grievance over which the union struck was, as it concedes, one which it had expressly agreed to settle by submission to final and binding arbitration proceedings. The strike which it called was a violation of that contractual obligation." 369 U.S. at 106, 82 S.Ct. at 578, 7 L.Ed.2d 593.

■■ Thus, any work stoppage designed to secure resolution of any grievance or contract dispute with any of these publishers was unprotected activity and the struck publisher could have discharged his striking employees without thereby committing an unfair labor practice. N. L. R. B. v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L. Ed. 832 (1953); N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682 (1939); Plasti-Line, Inc. v. N. L. R. B., 278 F.2d 482 (6 Cir. 1960); N. L. R. B. v. National Die Casting Co., 207 F.2d 344 (7 Cir. 1953); W. L. Mead, Inc., 113 NLRB 1040 (1955). In addition to being unprotected activity such stoppages and threats thereof constituted threats to the interest which all of these publishers had in bargaining on a multi-employer basis, and, being such, it was permissible for the publishers to respond by group action. We are not required to say that all employers bargaining as a unit have a legitimate joint interest in maintaining each and every clause of their collective bargaining contract. What we do decide is that such a joint interest may exist in connection with no-strike clauses designed to protect each member of a multi-member bargaining group from a sudden shutdown by a grievance strike.

The publishers in this case, as a result of their multi-employer negotiations with the unions representing their employees, secured a contractual commitment from each union purposed to insure that no publisher would have to suffer a grievance strike during the life of the contracts. In view of the perishability of news as a saleable commodity, the highly integrated nature of a newspaper publishing operation, and the difficulty of combating work stoppages suddenly called before deadline times, it is not difficult to perceive the importance to the publishers of securing union commitments to substitute the arbitral process for the grievance strike. If honored, the commitments assured the publishers that, at least for the lives of the contracts, no one

publisher would be rendered inoperative by a grievance strike while his fellows continued to publish. A decision on the part of a publisher's employees to violate this no-strike commitment, while perhaps prompted by plant circumstances peculiar to that individual publisher, necessarily involved an attack on the protective arrangement set forth in the multi-employer contracts.[9]

We are urged to distinguish the Buffalo Linen case on the ground that the strike tactic there involved was implemented during the course of bargaining for a new contract and was designed to secure concessions from *all* members of the employer unit by striking fewer than all of them. The Buffalo Linen case arose out of a fact situation different from the one here but the issue in each case is whether a strike tactic threat to the interest of employers in preserving employer group bargaining may be legitimately met by defensive group action. The strike tactic in the present case, though of a different sort from the one in Buffalo Linen, nevertheless had the same result of threatening the employers' interest in group bargaining. In Buffalo Linen the "whipsaw" strike tactic, if unchecked, would have enabled the union to gain concessions from the employers that could not have been realized if the multi-employer unit were respected. The strike tactic used here, if unchecked, would have succeeded in taking away from these employers an important protective arrangement which they had secured through union concessions extracted in the course of multi-employer bargaining. In short, though the strike tactic used in the case at bar operated upon all the members of the employer group in a less direct fash-

ion than that used in Buffalo Linen, it nevertheless threatened "the destruction of the employers' interest in bargaining on a group basis."

We note in passing that if, as petitioner urges, specific elements of a "whipsaw" tactic in the course of "bargaining" are required for the Buffalo Linen doctrine to apply, such elements are not entirely absent from this case. The strikes and threatened strikes were designed to secure employer capitulation in disputes over grievances by bypassing the established and contractually agreed-upon arbitral process. The processing of grievances under a collective bargaining contract has been held to be just as much a part of the bargaining process as the negotiation of an agreement. Conley v. Gibson, 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) ; N. L. R. B. v. Giustina Bros. Lumber Co., 253 F.2d 371, 373–374 (9 Cir. 1958) ; J. I. Case Co. v. N. L. R. B., 253 F.2d 149, 153 (7 Cir. 1958) ; N. L. R. B. v. J. W. Rutter-Rex Mfg. Co., 245 F.2d 594, 597 (5 Cir. 1957) ; N. L. R. B. v. Jacobs Mfg. Co., 196 F.2d 680, 683–684 (2 Cir. 1952). "[A]rbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself." United Steelworkers of America A.F.L.-C.I.O. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960). The record here indicates that, in addition to negotiating contracts with each union, the Publishers' Association, representing the entire body of employers in the unit, actively participated in that stage of the "bargaining process'" concerned with the processing of grievances. Moreover, the background evidence introduced, along

---

9. We agree with the Board's resolution of the issue of the responsibility of the various unions for the conduct of their worker members in resorting to breach of contract strikes during disputes over grievances. The Board noted that the stoppages did not appear to be purely "wildcat" in nature; that such strikes were used against the publishers with "annoying frequency"; that several incidents involved a union steward or shop chairman; and that union officials were in every instance able to get their striking members to return to work. Moreover, as the Board concluded, "In bargaining with the Association on a multi-employer basis, the craft unions obviously reaped certain benefits, but they also * * * necessarily subjected themselves to unit-wide response, in the event of problems involving the entire unit."

with the facts surrounding the disputes which resulted in the commencement of the proceedings before the Board, amply justified the Board's conclusions that unauthorized work stoppages occurred with "amazing frequency" and constituted a problem "common to all members" of the multi-employer bargaining unit. The strikes and employee threats to which these employers responded as a group, therefore, were not, as petitioner claims, purely local matters; circumstances existed which served to point up vividly what the Board termed the "unitwide nature" of this problem.

■ Having found that the joint action of these employers was a legitimate type of defensive activity we must now determine whether the effect of the challenged conduct on newspaper industry employees who, during the incidents recited in the complaint, were not members of the particular craft involved in one of the work stoppages at one of the publishers' plants was such as to make the respondents guilty of unfair labor practices. The Trial Examiner concluded that, because protected rights of the "neutral" employees were infringed by the implementation of the publishers' suspension agreement, the publishers violated Section 8(a)(1) of the Act. He reasoned that the use of the suspension agreement tended to influence the neutrals to apply pressure on their striking fellow workers, and therefore restrained the neutrals in their Section 7 right to refrain from concerted activity.

Though we, like the Board, have difficulty with the Trial Examiner's conclusions on this point and are inclined to regard his construction of the "refrain" clause of Section 7 as a highly artificial construction, we need not decide whether

the Section 7 rights found by the Trial Examiner did in fact exist and were violated. The Board, in evaluating the reasonableness of the publishers' defensive activity, assumed that the Section 7 rights found by him to exist did exist. After balancing the importance of the assumed Section 7 rights against the legitimate interest of the publishers in combating breach of contract work stoppages the Board found the suspension agreement and its implementation to be lawful. Explaining its decision the Board stated at the conclusion of its opinion:

> As the record demonstrates, the agreement was not used indiscriminately. Indeed, when time and circumstances permitted, Respondents took their case to other forums, for more orderly—and perhaps, ultimately, more satisfactory—resolution * * * *
>
> In these circumstances, we cannot say on balance that Respondents' suspension agreement, limited as it was to contract violations, and, as the record shows, selectively and carefully applied, exceeded permissible bounds of defensive conduct.[10]

The Buffalo Linen case itself involved employer defensive conduct which obviously had the effect of cutting into the Section 7 right to strike, a right which has been said to be entitled to "generous interpretation within the scope of the labor act." N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 235, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963). Yet, granted the legitimate interest of the employers there in protecting the integrity of their bargaining unit, and the absence of any anti-union animus, an adverse effect there on this Section 7 right did not auto-

10. The Board, earlier in its opinion, stated that the extension of the various grievance disputes to a broader area was neither the purpose nor the effect of the suspension agreement. "The agreement was formulated to discourage at inception the series of breach-of-contract strikes which have repeatedly confronted the publishers, and thus *reduce* or *eliminate* the parties' original area of dispute, insofar as it involved such strike activity. In a literal sense, an 'ounce of prevention' proved its worth as a 'pound of cure.'" It was also the Board's conclusion that the suspension agreement was not intended to, and did not, discourage Section 7 activities but rather the series of unauthorized work stoppages which experience had shown to pose a continuing threat to the publishers.

matically require a finding that Section 8 had been violated. Rather, the Board, faced with a conflict between the legitimate interests of employers and employees, was said by the Court to have the "delicate" responsibility of resolving that conflict subject to "limited judicial review." [11] The unanimous Court in Buffalo Linen was particularly careful to emphasize the importance of respecting the expertise of the Board in dealing with questions involving multi-employer bargaining. Quoting the dissenting opinion in the court below, it was pointed out that Congress intended "that the Board should continue its established administrative practice of certifying multi-employer units, and intended to leave to the Board's specialized judgment the inevitable questions concerning multi-employer bargaining bound to arise in the future." 353 U.S. at 96, 77 S.Ct. at 647, 1 L.Ed.2d 676.[12]

The Board's decision in the present case appears to reflect existing industrial realities. Undoubtedly many employers subject to the operation of our national labor laws are engaged in businesses employing workers represented by more than one labor union. Moreover, it would seem that, as with the newspaper industry in New York City, many such industries are highly integrated operations in which a shutdown of one portion of a plant soon results in the entire business coming to a halt. Therefore, to make unlawful a defensive lockout because it may ultimately result in loss of work for neutral employees in crafts different from that of a striking union would, even in the classic Buffalo Linen situation,[13] seriously limit the instances where the defensive lockout could be legitimately used. See N. L. R. B. v. Continental Baking Co., 221 F.2d 427, 437 (8 Cir. 1955); Local 50, Bakery & Confectionery Workers' Intern. Union of America, A.F.L. v. General Baking Co., 97 F.Supp. 73 (S.D.N.Y. 1951).[14]

Thus we hold that the Board did not err in striking a balance between the competing legitimate interests pressed in

11. "The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." N. L. R. B. v. Truck Drivers Local Union etc., 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957).

12. Only recently the Court has reaffirmed its position that the expertise of the Board in formulating labor policy is to be accorded substantial deference: "Here, as in other cases, we must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life, Republic Aviation Corp. v. [National] Labor [Relations] Board, 324 U.S. 793, 798 [65 S.Ct. 982, 985, 89 L.Ed. 1372]; Phelps Dodge Corp. v. [National] Labor [Relations] Board, supra [313 U.S. 177] at 194 [61 S.Ct. 845, at 852, 85 L.Ed. 1271], and of '[appraising] carefully the interest of both sides of any labor-management controversy in the diverse circumstances of particular cases' from its special understanding of 'the actualities of industrial relations.' [National] Labor [Relations]

Board v. United Steelworkers [of America, C. I. O.], supra [357 U.S. at 357], at 362–363 [78 S.Ct. at 1271, 2 L.Ed.2d 1383]." N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963).

13. Although the employees in Buffalo Linen obviously conducted businesses in which the striking drivers were part of only one facet of the operations, it is not clear whether other employees were laid off along with the drivers.

14. See N. L. R. B. v. Brown, 319 F.2d 7 (10 Cir.), petition for cert. filed, 84 S.Ct. 484 (U. S. Nov. 16, 1963), where the Court refused to condemn certain employer conduct because to do so would largely undercut the right of defensive lockout. There a union struck one member of a multi-employer bargaining group, and the non-struck members responded by locking out their employees. The struck employer then replaced the striking employees, and the other members of the bargaining group followed suit by temporarily replacing their locked out employees in order to continue operating. The court held this to be lawful, reasoning that a contrary holding would render "largely illusory" the right of lockout granted by Buffalo Linen.

this case. The employer conduct under examination was not of such a nature as necessarily to carry with it the indicia of an illegal intent. Cf. N. L. R. B. v. Erie Resistor Corp., supra. The Board's findings, largely based on uncontradicted testimony and stipulated facts, were supported by substantial evidence. See Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). And, in our view, the reasoning by which the Board arrived at the balance it struck here was not "inadequate, irrational or arbitrary." See N. L. R. B. v. Erie Resistor Corp., supra, 373 U.S. at 236, 83 S.Ct. at 1149, 10 L.Ed.2d 308.

The Board's order dismissing the complaint is affirmed.