**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MARYDALE PRODUCTS COMPANY, Inc., Respondent.**

**No. 19551.**

United States Court of Appeals Fifth Circuit.

Jan. 3, 1963.

Rehearing Denied March 13, 1963.

Stuart Rothman, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Melvin Pollack, Joseph C. Thackery, Attys., N. L. R. B., Washington, D. C., for petitioner.

Herman M. Baginsky, Cobb & Wright, Lloyd J. Cobb, New Orleans, La., for respondent.

Before HUTCHESON, WISDOM and GEWIN, Circuit Judges.

JOSEPH C. HUTCHESON, Jr., Circuit Judge.

This case is before the court on the petition of the National Labor Relations Board[1] for enforcement of its order[2] against Marydale Products Co., Inc., issued on October 20, 1961. The order is based upon the Board's findings that respondent: (1) violated Sec. 8(a) (1) and (3)[3] of the Act by refusing, after an "economic strike", to reinstate fifty-seven employees because they participated in the strike and by discharging five other employees because they were union sympathizers or were related to strikers; and (2) violated Sec. 8(a) (1) by threats of economic reprisal, surveillance, and interrogation. The order requires the respondent to cease and desist from those unfair labor practices, to reinstate the sixty-two discriminatees with back pay, and to post an appropriate notice.

Despite respondent's contentions to the contrary, the Board's findings of fact are supported by substantial evidence, in view of the record as a whole, including that evidence opposed to the Board's findings.[4] As to the finding that respondent discharged or refused to reinstate sixty-two employees in violation of Sec. 8(a) (1) and (3), the evidence shows the following. The employees of respondent[5] made wage demands and began work stoppages. With the assistance of a representative of a national union,[6] the workers organized pickets and subsequently organized a union. The representative from the national union and an employees' committee notified respondent that the strikers were ready to return to work, and the sixty-two workers involved in this case applied for reinstatement.[7] None of them were hired, although respondent continued to hire additional workers after the applications for reinstatement had been made.[8] The evidence shows, we believe, that respondent's general manager told the employees that respondent would close the plant before going union, and that no union member would be hired, and that he questioned employees who applied for reinstatement in regard to their union and strike activities. The Board was justified in finding that the workers were refused reinstatement because of their strike and union activity.

Respondent contends, however, that the workers were subject to replacement and had been, in fact, replaced before applying for replacement. Sixty-seven workers were hired during the course of the strike. The Board observes, however, that the work force had substantially increased during the course of the strike,[9] and, as we have already noted, that re-

1. Filed pursuant to Sec. 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(e).

2. 133 NLRB No. 118.

3. 29 U.S.C. § 158(a) (1) and (3). In pertinent part, these sections provide as follows:
   "(a) It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *
   "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * *."

4. See Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 487–488, 71 S.Ct. 456, 95 L.Ed. 456.

5. Respondent operates a sweet potato canning plant at Oak Grove, Louisiana. The dispute involved in this case occurred during the 1959 canning season.

6. The union involved is the United Packinghouse Workers of America.

7. Most of the applications were filed on Saturday, Sept. 5, or Monday, September 7.

8. From the end of the strike on September 5, to September 15, respondent hired 108 employees, comprised of twenty-two for the day shift and eighty-six for the night shift. Sixty-seven workers were hired during the course of the strike.

9. Before the walkout on August 29, respondent employed 195 employees on a day shift and 138 on a night shift. At the time that the strike ended on September 5, respondent had a work force of 260 employees, working a single shift,

spondent continued to hire workers after the strike was ended and after the application for reinstatement had been filed. On that basis, the record would certainly not warrant an inference that the workers had been permanently replaced. Respondent urges, however, that the Board failed, in considering this aspect of the case, to distinguish between the day and night shifts. The evidence shows, however, that the night shift was resumed only after the applications for reinstatement had been received, and that many of the sixty-two discriminatees expressed no preference as between the shifts or expressly stated that they would accept work on either shift. We therefore conclude that the Board was correct in finding that the discriminatees had not been permanently replaced.

■ As to the Board's finding that respondent interfered with, restrained, and coerced its employees in violation of Sec. 8(a) (1) of the Act, we believe that the evidence establishes the following. Officials of respondent made various inquiries as to who was participating in the strike and union activities, and the general manager and foreman made statements which, reasonably construed, meant that union members would not be hired and that the plant would be closed if it were unionized.

Respondent contends that, in any event, the workers were not within the protection of the Act, because they voluntarily left their jobs without making a prior demand upon their employer. In N. L. R. B. v. Washington Aluminum Co., 1962, 370 U.S. 9, 14, 82 S.Ct. 1099, 1102,

8 L.Ed.2d 298, the Supreme Court stated, in language appropriate to this case, that "We cannot agree that employees necessarily lose their right to engage in concerted activities under § 7 merely because they do not present a specific demand upon their employer to remedy a condition they find objectionable". There, it was held sufficient that, prior to the walkout, there had been individual, spontaneous protests concerning the working conditions. In the present case, the evidence shows that, before the work stoppages began, individual workers had protested the wage situation and asked for a wage increase. Those protests and demands were sufficient notice to the respondent.[10]

■ We deal, finally, with respondent's attack upon the order itself, on the ground that it is "unintelligible and incapable of enforcement", because, as among the employees concerned, it draws no distinctions in terms of the types of jobs remaining open to them, whether the workers would have accepted the jobs that had not been permanently refilled, and whether they were qualified for those open jobs. There are not such distinctions in the types of jobs at respondent's plants as to require greater specificity. In addition, any necessary determination of these matters can be made at the compliance stage of the proceeding.

We have considered respondent's other arguments, and we are of the opinion that they do not justify denying enforcement of the order.

The Board's order will be

Enforced.

including eighty-four who had previously worked a night shift. The two-shift operation was resumed on September 10. The work force was then stabilized at about 190 employees for the day shift and 150 for the night shift.

10. Our decision in N. L. R. B. v. Ingram, 5 Cir., 1960, 273 F.2d 670, cannot be taken

as requiring greater specificity in demands. The language to which respondent refers us dealt with the question of whether the Board had made out an actual discharge of the employees, in support of that portion of its order based upon an alleged discharge.