**GENERAL ELECTRIC COMPANY, BATTERY PRODUCTS, CAPACITOR DEPARTMENT, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 24548.

United States Court of Appeals
Fifth Circuit.

Aug. 22, 1968.

Rehearing Denied Oct. 28, 1968.

Robert C. Lanquist, Otto R. T. Bowden, Jacksonville, Fla., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Thomas R. Beech, Atty., N.L. R.B., Washington, D. C., for respondent.

Frank Hamilton, Jr., Tampa, Fla., amicus curiae.

Before BELL, GOLDBERG and DYER, Circuit Judges.

GOLDBERG, Circuit Judge:

In our assessment of another industrial drama, we again turn to the rise and decline of a local union: its birth and early struggles with adversity, its growth and drive to success, its frustrations in failing to maintain momentum, and its eventual exhaustion of power. As always we must search for the source of decline. Was union evanescence the result of its own fatal flaws, or was its strength sapped by management's unfair use of industrial weaponry? The Board examined the facts and numerous charges in the controversy at bar and held the company accountable. With two exceptions, involving the validity of a 1964 anti-strike campaign and a three-day delay in reinstating two employees after a strike in 1965, we enforce.

So that the current drama is not lost in a myriad of facts, we will first set out summarily the most significant dates and events. Relevant specifics of the union-company relations will then be analyzed more fully in discussions of various charges of National Labor Relations Act violations. We will consider —unfortunately, long after the fact—[1] allegations that the company transgressed union rights and thus violated Sections 8(a) (1), 8(a) (3), and 8(a) (5) of the Act.

The setting before us is the General Electric plant in Jacksonville, Florida, which began operations in the spring of 1963. By the summer of 1963 a union drive was underway. An election was conducted on July 24, 1963, which the union lost. That election was set aside because of the company's unduly rigid solicitation rule, and the union won the second election, on October 30, 1963, by a vote of 65–62. It was formally certified as a bargaining agent on January 21, 1964. Negotiations with the company began on February 13, 1964, and about nineteen meetings were held until April 16, when the meetings were broken off. Negotiations resumed on October 14, 1964, and a contract was signed on December 1, 1964, with an effective term from April 3, 1964 to April 3, 1965. In March, 1965, while the company and the union were bargaining for a second contract, a strong antiunion movement emerged among the employees in the plant. On April 5, 1965, the company initiated a plant-wide wage increase without the approval of the union. On April 23, all semblances of bargaining terminated.

The unfair labor practice proceedings originated with the filing of a charge on November 19, 1963. A second charge was filed on April 27, 1964. A third was filed on June 21, 1965. Due to initial dismissals of earlier charges by the Regional Director, no proceedings were held until November 29, 1965, at which time all charges were consolidated. Within the broad proscriptions of Sections 8(a) (1), 8(a) (3), and 8(a) (5), numerous specific complaints were alleged, and most were upheld by the Trial Examiner and the Board. We will therefore discuss them separately under the three respective statutory provisions.

A. *Violations of Section 8(a) (1)*

The Board found violations of Section 8(a) (1) in the following company activities: (1) interference, restraint, and coercion of employees both before and after certification of the union as bar-

---

1. We can well sympathize with the company, the union, and the employees for the long interval between action and legal reaction. However, we repair to the wisdom of the Supreme Court when, in enforcing a bargain order long after the loss of a union majority, it concluded: "Inordinate delay in any case is regrettable, but Congress has introduced no time limitation into the Act except that in § 10(b) [time limit concerning initial complaint procedure, not involved here]." NLRB v. Katz, 1962, 369 U.S. 736, 748, 82 S.Ct. 1107, 8 L.Ed.2d 230, 239 (fn. 16). See also Bryant Chucking Grinder Co. v. NLRB, 2 Cir. 1968, 389 F.2d 565, 568 (Judge Friendly, concurring), cert. den., 392 U.S. 908, 88 S.Ct. 2055, 20 L.Ed.2d 1366 [June 10, 1968].

gaining agent; (2) a unilateral raise in wages of maintenance employees on January 20, 1964; (3) interjection of the company into union decisions regarding a potential strike in April, 1964; (4) suspension of employee Sherley after termination of the union's strike in June, 1965; and (5) delay in reinstating two employees after termination of the union's strike in June, 1965. In this opinion the last issue will be considered in a separate section infra, together with the accompanying finding that the delay in reinstatement violated Section 8(a) (3).

(1) *Interference, Restraint, and Coercion.* According to the uncontradicted testimony at the Trial Examiner's hearing, on numerous occasions from June, 1963, to April, 1964, various company representatives interrogated and threatened employees concerning their union activities. Although in no case did any company spokesman expressly place an employee's job in jeopardy, the impression of company surveillance was readily perceptible. Moreover, in some instances implied threats were advanced. For example, shortly before the second union election one company supervisor informed a group of employees, "We can't get along with a third party." Shortly after the election another supervisor admonished an employee for interfering with the work of other employees by talking with them. When asked by the employee how he knew of such conduct (including conduct on the job and in the lunchroom), the supervisor replied that he knew what was going on at all times whether he was there or not.

■ The company does not contest the Board's factual findings. Instead, it claims that the acts in question were "minor, unconnected, isolated occurrences which happened for the most part prior to the second election." We agree with the company that the acts in question can hardly be labeled catastrophic (nor can the remedy, a cease and desist order). The acts were, however, readily susceptible to a conclusion that the com-

pany was, both before and after each election, discouraging union membership and participation through subtle threats and surveillance. We find relevant a recent pronouncement on this point by our Court:

> "The evidence presented on the § 8 (a) (1) violation need not be detailed at any great length. The infractions were minor, but the Board's findings that the Employer had created an impression of surveillance by letting it be known that the Union meetings were being watched, by asking two employees about the activities at the Union meetings, and by allowing a minor supervisor to state that 'the man upstairs would close the doors before he would let the Teamsters come in' are enough to sustain the § 8(a) (1) order." NLRB v. Great Dane Trailers, Inc., 396 F.2d 769 [June 24, 1968].

Even more pertinent is the case NLRB v. Brown-Dunkin Co., 10 Cir. 1961, 287 F.2d 17, where the antiunion activity had been less than atrocious and indeed had failed to prevent the union's election victory and formal certification. In that opinion Chief Judge Murrah stated:

> "[T]he fact that the Company's efforts were unsuccessful does not necessarily lead to the conclusion that they were not restrictive or coercive. N.L.R.B. v. Hill & Hill Truck Line, 5 Cir., 266 F.2d 883. See also N.L.R.B. v. Beatrice Foods Co., 10 Cir., 183 F. 2d 726; N.L.R.B. v. Fairmont Creamery Co., 10 Cir., 169 F.2d 169. In the last analysis, the function of drawing the rather nebulous line between permissible persuasion and prohibited coercive conduct lies within the special competence of the Board which, as we know, is primarily responsible for the effectuation of the purposes of the Act. It is sufficient to say that the record evidence is susceptible of an inference of coercive interference, and we are therefore unable to say that the Board's conclusions in this respect are unwarranted in fact and law.

See N.L.R.B. v. Central Oklahoma Milk Producers Association, 10 Cir., 285 F.2d 495." 287 F.2d at 18.

■■ The *Brown-Dunkin* opinion also disposes of the company's argument that the election victory rendered moot any prior violations. It is well established that illegal interference with union activity need not be successful to be accountable. NLRB v. Mayes Bros., Inc., 5 Cir. 1967, 383 F.2d 242, 247; NLRB v. Hill & Hill Truck Line, Inc., 5 Cir. 1959, 266 F.2d 883, 885; Elastic Stop Nut Corp. v. NLRB, 8 Cir. 1944, 142 F.2d 371, 377–378, cert. den., 323 U.S. 722, 65 S.Ct. 55, 89 L.Ed. 580; NLRB v. Brezner Tanning Co., 1 Cir. 1944, 141 F.2d 62, 64. The case at bar, like *Brown-Dunkin,* adds to that general proposition the corollary that union certifications do not always provide or dispense absolutions from past National Labor Relations Act sins.[2]

■■ (2) *Unilateral Wage Increase.* The Board ruled that the company's unilateral wage increase for maintenance employees, instituted over the union's objection and only one day before the Regional Director had certified the union, was a violation of Section 8(a) (1). Two rationales were expressed by the Trial Examiner and were left unaltered by the Board: (1) the wage increase "was calculated to influence the choice of a bargaining representative in the event the Regional Director should order a new election," and (2) the increase "was calculated to bypass, undercut, and undermine the Union's status as the statutory representative of the employees in the event a certification was issued."

We find no merit to the first rationale which, unfortunately, was the only one examined in depth by the Trial Examiner, the Board, or the General Counsel on appeal. To be sure, the law is clearly established that a company may not grant a wage increase prior to a certification election in order to influence the votes of its employees. NLRB v. Exchange Parts Co., 1964, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435. Our Circuit, however, has refused to expand the *Exchange Parts* doctrine to embrace the proposition that a wage increase undertaken after an election (and while objections are pending) can be assumed to be motivated by a desire to influence a potential re-election. NLRB v. Ambox, Inc., 5 Cir. 1966, 357 F.2d 138, 141.[3]

■ If we turn to the Trial Examiner's second rationale, we see that the *Ambox* decision is readily distinguishable. In *Ambox* the union had lost the election, and thus at the time of the wage increase it did not have even an arguable right to be consulted. On the contrary, in the case at bar the union had won the election. Clearly, the company's unilateral increase, over the union's objections, would have been vulnerable to attack if it had been instituted after formal certification. See NLRB v. Katz, 1962, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230. The only question before us is whether such unilateral action was prohibited during the hiatus which followed the union's election victory but which was prior to formal certification. In fact, that ques-

2. Of course, when certification is granted after an election "properly held under circumstances which permitted the employees to freely choose their bargaining representative without restraint, coercion, threatened reprisals or interference by petitioners," portions of the Board's pre-election order which concern mainly the election may be mooted. General Engineering, Inc. v. NLRB, 9 Cir. 1962, 311 F.2d 570, 572–573. Such is not the case at bar, however, since the company's coercive activity occurred prior, during, and after the October, 1963, election which

was won by the union. And see NLRB v. Marsh Supermarkets, Inc., 7 Cir. 1963, 327 F.2d 109, 110–111, which questions the *General Engineering* rationale.

3. The Trial Examiner based his conclusions in great part on the Board's ruling in *Ambox* which had found an illegal re-election motive in the company's wage increase. The decision of our Court in that case came down only shortly before the Trial Examiner's ruling in the case at bar and may not have been available to the Trial Examiner.

tion has already been answered by our Court.

In NLRB v. Zelrich Co., 5 Cir. 1965, 344 F.2d 1011 we examined a company's activity between the union's election victory on December 14, 1962, and the Regional Director's formal certification of the union on January 23, 1963. The Board had found Section 8(a) (1) and Section 8(a) (5) violations in the withholding of 1962 Christmas bonuses and in the granting of general wage increases on January 18, 1963. Zelrich Co., 1963, 144 NLRB 1381, 1383, 1391–1392. Our Court enforced the order in full,[4] and without relying on the *Exchange Parts* doctrine. The following year we confronted a similar situation and, in upholding a related 8(a) (1) finding, stated explicitly: "The unilateral action of the company relating thereto constituted a refusal to bargain, and it is not excused by the fact it occurred before certification." NLRB v. Zelrich Co., 5th Cir., 1965, 344 F.2d 1011." NLRB v. Laney & Duke Storage Whse. Co., 5 Cir. 1966, 369 F.2d 859, 866.

The company would distinguish *Zelrich* and *Laney & Duke* by showing that its wage increase was not an attempt to undercut the union but was rather an attempt to avert a sudden flurry of em-

---

4. We note that Zelrich's action was held violative of both 8(a)(1) and 8(a)(5), despite the fact that formal certification had not been issued. It is likely that, in refusing to find an 8(a)(5) violation in the case at bar, the Trial Examiner misinterpreted Board policy. The Trial Examiner cited Harbor Chevrolet Co., 1951, 93 NLRB 1326, 1327–1328, for the proposition that "Board precedent precludes a finding of a refusal to bargain during the period when the Union's majority status was unresolved." The *Harbor Chevrolet* case, however, is readily distinguishable from the *Zelrich* case (as well as from the one at bar). In the former case, during the hiatus between the union election victory and the final certification, company activity vis-a-vis the union was limited to (1) a refusal to answer the union's letter dated immediately after the election and (2) a reply to another union letter just prior to certification informing the union that the company would bargain only after certification. Such passive responses are not at all similar to the bold unilateral action on essential subjects of bargaining which was taken by Zelrich and by the company at bar. In fact, in King Radio Corp., Inc., 1967, 166 NLRB No. 70, the Board indicated that even passive activity might constitute an 8(a)(5) violation if definitely in bad faith. (But see Louisville Chair Co., Inc., 1966, 161 NLRB No. 31, affirmed, NLRB v. Louisville Chair Co., Inc., 6 Cir. 1967, 385 F.2d 922, cert. den., 390 U.S. 1013, 88 S.Ct. 1264, 20 L.Ed.2d 163, which indicates that a distinction might be drawn between the period before Regional Director certification and the period before final denial of review by the Board.)

Regardless of the Board's position on a company's un-cooperative nature before certification, its policy on unilateral wage increases has always been consistent with *Zelrich*. We quote, for example, from Fleming Mfg. Co., 1957, 119 NLRB 452, 464 (Trial Examiner's Report):

"That such unilateral action with respect to wages, hours, and working conditions was in derogation of Respondent's obligation to bargain with the Union as the duly elected exclusive bargaining representative is now so well settled as to require no citation of authority. It is not material that the unilateral action was taken before Respondent received the document from the Regional Director certifying the Union as the exclusive representative and before any new bargaining request was made by the Union. The Union's majority was established on July 16, 1956, when the tally of ballots was counted. On that day McClelland admittedly was aware of the establishment of the Union's majority status. The Board has held that once any employer becomes aware of a properly designated bargaining representative, he may not unilaterally make changes in the employee's terms and conditions of employment, without first giving the representative an opportunity to bargain collectively. [footnoting the following authority: 16th Annual Report of the National Labor Relations Board, 1951, page 199; Jordan Bus Co., 1954, 107 NLRB 717, 729; Cranston Print Works Co., 1956, 115 NLRB 537, 545–547; Tennessee Valley Broadcasting Co., 1949, 83 NLRB 895, 897–898.]"

In the *Fleming* case the Trial Examiner ruled that Fleming's activity had violated both 8(a)(1) and 8(a)(5), and these findings were affirmed in full by the Board. 119 NLRB at 452.

ployee resignations. It conjures for us the "economic emergency" of dissatisfaction in the maintenance department due to the company's low wage rates and the need for immediate action. We can hardly be impressed in the light of the Trial Examiner's finding that employee dissatisfaction and complaints had existed at least seven months prior to the unilateral increase.[5] Moreover, the Trial Examiner discredited the company's rationale for its increase on the additional ground that the company's own negotiator denied such rationale during subsequent negotiations.

(3) *Interjection of the Company into Union Matters.* Collective bargaining began on February 13, 1964. During April, however, an impasse was reached, and on April 16 negotiations were broken off. Aware of the possibility of a union strike, the company on April 17 instituted an anti-strike campaign in the plant. During the campaign numerous publications were distributed to employees warning them of the loss of business which might result from a strike and asking them to vote against a strike in the union meeting and to continue working even if a strike were called. Although the anti-strike drive was quite extensive (and was successful in averting a strike), it contained no threats of retaliation and no special promises of benefits to strike-breakers.

The Trial Examiner based his finding of an 8(a) (1) violation on Borg-Warner Corp., 1955, 113 NLRB 1288, modified and remanded sub nom NLRB v. Wooster Division of Borg-Warner Corp., 6 Cir. 1956, 236 F.2d 898, reversed in part, Board enforced in full, 1958, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed. 823. In that case the company had asserted as a mandatory subject of bargaining a "ballot" clause, requiring a pre-strike secret vote of both union and nonunion employees as to the employer's last offer. Such a clause, as the Supreme Court noted, "enables the employer, in effect, to deal with its employees rather than with their statutory representative." 356 U.S. at 350, 78 S.Ct. at 723. Because the company had insisted that its collective-bargaining contract include this clause, it was held to have violated Section 8(a) (5).

Our acceptance of the *Borg-Warner* doctrine does not demand enforcement of the Board's order, however. In *Borg-Warner* the company had insisted on a contract provision which would have automatically removed all strike decisions from union control and would have re-

5. The Trial Examiner expressly found that most employees in the maintenance department had "complained frequently to their supervisors from June-July, 1963, to January, 1964, that their rates were too low." In its appellate brief the company claims that no evidence supports the holding that any complaint was raised before October 9, 1963. We refer the company to page 28 of the Joint Appendix and to the following testimony of employee Rabbitt:

"Q Did you ever threaten to quit or leave if you didn't get a pay raise?

A I wouldn't say that I threatened to leave. I was asked, or I have told Mr. Bramer, in fact, on several occasions that I felt the wages were too low, and if they could not settle something and pay us decent wages, I would leave as soon as I could find me another job.

Q How long back was that, that you told that to the company, sir?

A Oh, that was as far back as July of 1963.

Q How about the other employees? Do you have any knowledge of whether any of the other employees complained or said anything about the wages? I mean first-hand knowledge and not hearsay.

A Yes. I have heard Chester Searle complain on several occasions to Mr. Bramer.

Q And how long ago was that?

A That was about the same time. I would say from June and July on through. After Mr. Merritt took over as supervisor of maintenance, at our weekly meetings were, or rather, that we were holding, I believe that 90 percent of the employees in there complaining of the low wages and stating that they felt that they would leave if they could get more money somewhere else."

structured bargaining into a three-party mold. To the contrary, in the case at bar no automatic undercutting procedure was involved. Instead, the company attempted by persuasion to prevent one specific strike.

On the issue of legal persuasion, we find a close analogy in another line of cases stemming from the Board's decision in The Texas Co., 1951, 93 NLRB 1358, reversed on other grounds sub nom Texas Co. v. NLRB, 9 Cir. 1952, 198 F.2d 540. In that case the company had encouraged striking employees to return to work by sending to them a letter quite similar to the publications we consider at bar.[6] Analyzing this strikebreaking attempt, the Board concluded:

"Absent a threat or a promise of benefit designed to coerce the strikers into returning by the deadline date, the legality of the Respondent's individual solicitation of the strikers must be determined against the background in which such solicitation was done. For, although the Board has, in the past, found individual solicitation of strikers violative of the Act, in all such cases one or both of the following two factors has been present: (1) The solicitation has constituted an integral part of a pattern of illegal opposition to the purposes of the Act as evidenced by the Respondent's entire course of conduct, or (2) the solicitation has been conducted under circumstances, and in a manner, reasonably calculated to undermine the strikers' collective bargaining representative and to demonstrate that the Respondent sought individual rather than collective bargaining. Neither factor is present here." 93 NLRB at 1360–1361.

Even after the Borg-Warner litigation The Texas Co. doctrine has continued to enjoy Board support, Coca Cola Bottling Co. of Louisville, 1967, 166 NLRB No. 16, see also International Telephone and Telegraph Corp., 1966, 159 NLRB 1757, 1765, 1781, modified on other grounds sub nom International Telephone and Telegraph Corp. v. NLRB, 3 Cir. 1967, 382 F.2d 366, cert. den., 1968, 389 U.S. 1039, 88 S.Ct. 777, 19 L.Ed.2d 829, and the same principles are prevalent in court decisions. NLRB v. Wooster Division of Borg-Warner Corp., 6 Cir. 1956, 236 F.2d 898, 905–906 (and authority cited therein), reversed on other grounds, supra. Cf. NLRB v. Movie Star, Inc., 5 Cir. 1966, 361 F.2d 346, 349. To be sure, the line between Borg-Warner violations and activity sanctified by Texas Co. may be rather slim. Thus, individual solicitation and interrogation of strikers has been held as violative of the Act. NLRB v. Montgomery Ward & Co., 9 Cir. 1943, 133 F.2d 676, 680–682, 146 A.L.R. 1045; The Stanley Works, 1954, 108 NLRB 734, 735–736.[7] Nevertheless,

---

6. We quote The Texas Company's letter in full:

"There is no indication at present when the strike called by the Oil Workers International Union (CIO) will end. It has therefore been decided to resume normal Producing Department Operations in the Los Angeles Basin and Ventura Districts as promptly as possible.

Employees who return to work on or before October 4, 1948, will find jobs available for them. After October 4, 1948, full measure will be taken to fill all remaining vacancies from every available source. As to those employees who do not return to work on or before October 4, 1948, the Company will take whatever action may be deemed to be proper at the time.

You may have been told that if you come back to work before the strike is ended, the Union will compel the Company to discharge or otherwise discriminate against you. I assure you no employee returning to work before the strike is ended will be discriminated against or penalized now or in the future because of that fact.

If you want to return to work, you should communicate with your Foreman or Superintendent for instructions."

7. The synthesis of potentially conflicting doctrines is perhaps best illustrated by the following excerpt from The Stanley Works, supra:

"While an employer may, without violating the Act, inform the employees

in the case at bar we find no individual solicitation or interrogation and insufficient evidence to justify a conclusion that the company was bypassing its certified bargaining agent.

In a separate section in his opinion the Trial Examiner expressly refused to find the company guilty of over-all illegal opposition to the union. We, therefore, conclude that the company's campaign meets the *Texas Co.* tests. We add, in regard to the anti-strike publications, what we have said before, "that the Board reads too much into this language." NLRB v. Movie Star, Inc., supra, quoting from NLRB v. Southwire Co., 5 Cir. 1965, 352 F.2d 346, 348. Enforcement of this portion of the Board's order is denied.

(4) *Suspension of Sherley:* The Board's finding of an 8(a) (1) violation in employee Sherley's suspension is invulnerable. The company's attack is evidence-oriented and is doomed by the Trial Examiner's thorough analysis of both the testimonial facts and the credibility of the witnesses, which analysis was affirmed by the Board. Under the doctrine of NLRB v. Burnup & Sims, 1964, 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed. 2d 1, the company's mistaken belief that Sherley had engaged in misconduct does not preclude a finding that her suspension violated Section 8(a) (1).

B. *Violations of Section 8(a) (3) and Section 8(a) (1)*

The Board found that the company had violated Sections 8(a) (3) and 8(a) (1) in delaying the recall of two employees after the union's strike in May-June, 1965. That strike ended on Thursday, June 3, when employee and union local president James Wetherington wired the company that the employees would begin returning to work on their regular shifts, beginning 11 p. m. that night. The company replied by wire: "Since work schedules will have to be adjusted

to accommodate strikers, supervisors will notify employees promptly starting tomorrow regarding their report in schedules." Several employees were returned to work immediately; however, when Wetherington and co-worker, William Mitchell, appeared at the plant on their regular shift at 7 a. m. on Friday morning, June 4, they were told to wait until notified by the company. They were notified to return on Wednesday, June 9, and did so.

Based on this five-day delay (actually three work days since Monday and Tuesday were off-days), the Board ordered the company to cease and desist its discriminatory recall procedure and to make whole Wetherington and Mitchell for their net loss of pay from June 4, 1965, to June 9, 1965. It was the Board's conclusion that the delay in recall was aimed purposefully at the union's president and was the company's method of discouraging union activities. We find that this conclusion is not supported by substantial evidence. Nor, as we shall discuss, was the business justification for the delay outweighed by its adverse effect on the union.

Wetherington and Mitchell were low-level employees on the company's first shift. During the strike the company hired two employees to perform Wetherington's and Mitchell's jobs. The company did not intend the replacements to be permanent; however, it did intend to keep the two new workers, and on June 9 it transferred them to different positions in the same department. The company's delay in reassigning the two replacements and reinstating the two strikers was explained on two grounds. First, the company stated that it needed a few days to reorganize its various working shifts after termination of the strike. It noted that employees who manned critical operations in the department were reinstated immediately, but non-critical employees (including Weth-

of the status of its negotiations with a union, or even urge the employees to persuade union leadership to accept its last offer, an employer may not by-

pass the exclusive bargaining representative by dealing with the employees on bargainable subject matters." 108 NLRB at 735–736.

erington and Mitchell) were rescheduled only as normal shifts could be arranged. Second, the company explained that it delayed until Wednesday the reassignment of the two temporary replacements because Saturday and Sunday were "overtime" days and the company wanted to avoid paying time-and-a-half while it was re-training these new employees.

 The Trial Examiner countered the first rationale with a finding that no loss of efficiency would have resulted from the immediate release of two low-level novices and their replacement by two low-level veterans. We find substantial evidence to support this finding. The Trial Examiner, however, found no evidence to refute the company's second rationale and instead ruled that such rationale, if true, was insufficient to justify the delay in recall. We are thus confronted with a provocative question of law: Can an honest desire for economy justify a company's delay until after its weekly overtime period of the transfer of new employees to other positions and the concomitant reinstatement of economic strikers?[8] Our answer must be in the affirmative.

 We start our analysis with the general proposition that although employees who engage in an economic strike have no absolute right of reinstatement, NLRB v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381, they do have a qualified safeguard against discrimination in reinstatement. NLRB v. Fleetwood Trailer Co., 1967, 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed. 614; NLRB v. Albritton Engineering Corp., 5 Cir. 1965, 340 F.2d 281, 283–285, cert. den., 382 U.S. 815, 86 S.Ct. 31, 15 L.Ed.2d 62; NLRB v.

R. C. Can Co., 5 Cir. 1964, 328 F.2d 974, 979–982; NLRB v. Marydale Products Co., 5 Cir. 1963, 311 F.2d 890, cert. den., 375 U.S. 817, 84 S.Ct. 53, 11 L.Ed.2d 52. Recently, the Supreme Court added dimension to this proposition when in NLRB v. Fleetwood Trailer Co., supra, it adopted for purposes of reinstatement of economic strikers the following principles set out six months earlier in NLRB v. Great Dane Trailers, 1967, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027:

"From this review of our recent decisions, several principles of controlling importance here can be distilled. First, if it can reasonably be concluded that the employer's discriminatory conduct was 'inherently destructive' of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight', an antiunion motivation must be proved to sustain the charge *if* [emphasis in Supreme Court's opinion] the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* [emphasis in Supreme Court's opinion] extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him." 388 U.S. at 34, 87 S.Ct. at 1798.[9]

8. The Trial Examiner indicated that the 1965 strike was not an unfair labor practice strike. The Board did not modify this finding, nor did the Board or the union on appeal assert that the strike was brought on by unfair labor practices. We, therefore, accept the Trial Examiner's implied finding that the strike was an economic strike.

9. Although the above paragraph begins by attributing the principles contained therein to prior decisions, a few sources see it as a subtle prophecy of change. For example, Mr. Justice Harlan's dissent in the case expresses the fear that the Board may seize upon the term "*substantial* business justifications" to begin setting up guidelines for economic confron-

Our first consideration under the *Great Dane* principles is that of effect, i. e., "discriminatory conduct which could have adversely affected employee rights to some extent." The Court in that case stated emphatically: "There is little question but that the result of the company's refusal to pay vacation benefits to strikers was discrimination in its simplest form. * * * Similarly, there can be no doubt but that the discrimination was capable of discouraging membership in a labor organization within the meaning of the statute." 388 U.S. at 32, 87 S.Ct. at 1796. In *Fleetwood Trailer* the Court referred extensively to *Great Dane* and then added: "A refusal to reinstate striking employees, which is involved in this case, is clearly no less destructive of important employee rights than a refusal to make vacation payments." 389 U.S. at 380, 88 S.Ct. at 547. Following these statements, we can hardly deny that a delay in reinstating economic strikers after termination of the strike constitutes "discriminatory conduct which could have adversely affected employee rights to *some* extent."

On the other hand, we can positively categorize whatever adverse effect the three-day delay in wages might have had on union activities as being "comparatively slight" rather than "inherently destructive." [10] Moreover, the company has come forward with evidence of a business justification, which the Board does not deny but rather dismisses as not being "legitimate and substantial." Returning to the question of law previously posited, then, we find it to be narrowed down to the issue of whether, in the post-strike rescheduling of strikers, the concern of avoiding overtime pay is legitimate and substantial.[11]

The conflicting legitimate interests are now readily defined. The company has an interest in keeping strike costs to a minimum and, especially after the strike has terminated, it has a highly defensible interest in returning production and production costs to their normal level. To insist on the company's immediate reinstatement of all strikers could be detrimental to that interest. On the other hand, the union has a valid interest in seeing that its members are treated without discrimination, and that when union activities are terminated, the members return to their previous wage-earning jobs.

Indeed, as is noted in *Fleetwood Trailer,* supra, in at least two instances

---

tations. If such occurrence is allowed, he continues, the Board, "may well impinge upon the accepted principle that 'the right to bargain collectively does not entail any "right" to insist on one's position free from economic disadvantage.'" 388 U.S. at 39, 87 S.Ct. at 1800, 18 L.Ed. 2d at 1038. On the other hand, two commentators, in a scholarly article which analyzes historically and analytically the 8(a)(1) and 8(a)(3) tests of (1) effect, (2) competing interests, and (3) motivation, applaud *Great Dane* in that it, "can be interpreted as an implied partial rejection of the motive requirement in, at least, its *Radio Officers* form." Christensen and Svanoe, "Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality," 88 Yale L.J. 1269, 1321 (1968).

10. Although the Supreme Court did not categorize the company's activity in either *Great Dane* or *Fleetwood Trailer,* prior Supreme Court findings of "inher-

ently destructive" acts are quite distinguishable in their facts from the case at bar. See NLRB v. Erie Resistor Corp., 1963, 373 U.S. 221, 83 S.Ct. 1139, 10 L. Ed.2d 308, 94 ALR2d 1147 (additional seniority given to replacements and strikers who returned to work during a strike). Compare American Ship Building Co. v. NLRB, 1965, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (lockout during bargaining impasse *not* inherently destructive).

11. We state the above issue realizing that if specific evidence of antiunion motivation for the delay had been considered, the issues would have been more complex. "[A]ntiunion motivation will convert an otherwise ordinary business act into an unfair labor practice." NLRB v. Brown, 1965, 380 U.S. 278, 288, 85 S.Ct. 980, 986, 13 L.Ed.2d 839. A thoughtful critique of this principle is found at Christensen, supra note 9, at 1326–1327 (fn. 176 and accompanying text).

the interest of the company prevails: (1) when during an economic strike permanent replacements are hired in order to continue operations, see NLRB v. Mackay Radio & Telegraph Co., supra, and (2) when the striker's job has been eliminated in order to adapt to changes in business conditions or to improve efficiency, see NLRB v. R. C. Can Co., supra, 328 F.2d at 980 (fn. 8 and accompanying text). We find significant parallels to those instances in the case at bar. Soon after the strike began on May 24 the two replacements were hired. Their jobs during the strike were the same as those of Wetherington and Mitchell, but the company's representative testified that the employees were retained after the strike both as substitutes for vacationing employees and as trainees for more critical operations. (He added that the company was in the process of doubling its operations.) Under the *Mackay Radio & Telegraph* doctrine the company could have kept the two replacements in Wetherington's and Mitchell's jobs permanently, and, as long as no discrimination was shown, the union could have raised no complaint. It is inconceivable that the company should be penalized for attempting to reopen its strikers' former jobs by shuffling its new employees to different positions when it merely delays a few days to avoid overtime excesses.

Our denial of enforcement is done with full awareness of the Supreme Court's admonition in *Fleetwood Trailer*: "It is the primary responsibility of the Board and not of the courts 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy.'" 389 U.S. at 378, 88 S.Ct. at 546. We tread lightly in areas such as these, imbued as they are with industrial relations subtleties. Nevertheless, we must not condone an erroneous conception of the balance, especially when the conflicting interests may not have been explored by the Board in their full import.[12] We therefore deny enforcement of this portion of the Board's order.

### C. *Violations of Section 8(a) (5)*

The Board found violations of Section 8(a) (5) in the following company activities: (1) total inflexibility on and after March 24, 1964, in the company's position on wage increases and the simultaneous refusal to furnish the union with information regarding area wage surveys upon which its wage position was based; (2) insistence on and after March 31, 1965, that any contract which the company might sign must include a defeasance clause, which insistence was soon followed by the termination of bargaining; and (3) refusal to resume negotiations with the union during May-June, 1965, until the union terminated its strike. Although the Trial Examiner had omitted any bargaining order from his proposed remedies, the Board's sole modification of the Trial Examiner's decision was the addition of a nine-month bargaining order. We will first discuss the specific allegations of 8(a) (5) violations and then conclude with a review of the Board's order.

(1) Wage Increase—Wage Survey. On August 26, 1963, the company increased its employees' wages and at the same time announced a further increase to be awarded more than nineteen months later on April 5, 1965. We quote in part from the August, 1963, announcement:

"This is the first of two pay increases to be made available to local General Electric employees in a wage and benefit package which also includes

---

12. In his section on the delay in recall, the Trial Examiner stated no authority for his conclusion and, factually, omitted any reference to the continued tenure of the two new employees. The Board's summary affirmance for lack of prejudicial error indicates a possible failure to have before it the complete situational basis in order to "strike the proper balance." (This inference is strengthened by the company's appellate brief which contests rather vigorously the Trial Examiner's first, factual rationale for the delay and practically overlooks the second rationale.)

some 20 improvements in vacation, insurance and pension. *The second pay increase, also in the magnitude of five cents or more per hour, will be awarded April 5, 1965,* according to Mr. Hart [the company's general manager]." (Emphasis added.)

No further plant-wide increase occurred until April 5, 1965, when the company unilaterally granted a wage increase of 2½% or five cents an hour, whichever was greater. We quote in part from the company's announcement of April 6, 1965:

"We are putting into effect a wage increase for all non-exempt employees. *This increase was announced on a company-wide basis and here in Gainesville in August, 1963.*

\* \* \* \* \* \*

Many other benefits will be adjusted upward—automatically—with the April 5th raise in pay." (Emphasis added.)

During the period between August 26, 1963, and April 5, 1965, the company's employees had voted in a union, the Board had certified that union as the employees' bargaining representative, collective bargaining had proceeded on the surface, and the company and the union had executed a one-year contract. The company's rigid adherence to prior wage predictions in the face of such intervening events might in itself raise grave suspicions that the company was bargaining in less than good faith. The Trial Examiner, moreover, did not stop with the above facts, and instead clearly supported his refusal-to-bargain finding with specific and substantial evidence.

The Trial Examiner excerpted numerous portions of the collective bargaining minutes to show bad faith in the company's inflexible position on wage increases and its refusal to furnish information regarding the area wage surveys upon which it was conclusively basing its proposed wage increase. We find that these excerpts accurately represent the company's total failure to bargain in good faith as to wages on and after March 24, 1964.

The company's defense of its failure to supply wage survey information fails to raise substantive doubts. The company suggests that, contrary to the findings of the Trial Examiner, the company relied upon more than one wage survey and the data upon which it eventually relied could have been gathered with relative ease by the union. We can hardly be convinced in light of the company's refusal to either bargain with reference to the data which the union had gathered or to list for the union the comparative wage scales upon which it was relying. The following exchange during a bargaining session epitomizes the company's indefensible refusal to get to the specifics and its ambiguous but determined adherence to its own store of knowledge:

Company:

We have reviewed our jobs and in our judgment, they are properly paid. You have failed to establish the average relationship that I explained to you in detail previously.

Union:

What other recourse do we have? We have given you our findings and yet you continue to say that in your judgment these people are properly paid. You will use this argument regardless of what we may propose.

Company:

Perhaps you are right, but for one reason or another, you have chosen to overlook one of our most reasonable yard sticks of whether or not rates are paid properly and that is the survey which indicates how much people are earning with the Battery Products Section as compared to what they were earning before their employment. This demonstrates very clearly the improvement people receive when they accepted positions in this plant, which is at least 25%.

Union:

We feel that is a completely invalid measurement, it has nothing to do with what we are discussing. How-

ever, we would like to ask you to make this information available to us so we can discuss it intelligently.

Company:

No, we will not provide you with this information, Mr. Schultz. I have explained to you it shows about a 25% increase and I see no reason to provide you with each individual case. You, of course, have other ways of collecting the information such as asking people themselves.

The Supreme Court informs us in NLRB v. Truitt, 1956, 351 U.S. 149, 152–153, 76 S.Ct. 753, 755–756, 100 L.Ed. 1027, 1032:

"Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy. And it would certainly not be far-fetched for a trier of fact to reach the conclusion that bargaining lacks good faith when an employer mechanically repeats a claim of inability to pay without making the slightest effort to substantiate the claim."

That this philosophy was not to be confined in its application to the exact factual situation involved in *Truitt* was made quite clear by the Court seven months later in NLRB v. F. W. Woolworth Co., 1956, 352 U.S. 938, 77 S.Ct. 261, 1 L.Ed.2d 235. In that case the Ninth Circuit had consciously and expressly given *Truitt* a narrow scope. It had pointed out that in its case "there seems to have been no contention that Woolworth could not pay" and had concluded that the union's demand for wage data was no more than a "Well, we might find something." NLRB v. F. W. Woolworth Co., 9 Cir. 1956, 235 F.2d 319, 322, 323. In a short per curiam opinion the Supreme Court reversed the lower court, stating in full: "The Board acted within its allowable discretion in

finding that under the circumstances of this case failure to furnish wage information constituted an unfair labor practice [citing *Truitt* and N.L.R.B. v. Universal Camera, Corp., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456]." 352 U.S. 938, 77 S.Ct. 261.

■ Our Circuit's acceptance of the "broad rule" in compulsory disclosure antedates *Truitt*, NLRB v. Item Co., 5 Cir. 1955, 220 F.2d 956, 958, cert. den., 350 U.S. 836, 76 S.Ct. 73, 100 L.Ed. 746, and we have since 'then adhered both to a broad application of *Truitt* and to the resulting deference to the Board's discretion. NLRB v. Celotex Corp., 5 Cir. 1966, 364 F.2d 552, cert. den., 385 U.S. 987, 87 S.Ct. 601, 17 L.Ed.2d 450. Compare Sinclair Refining Co. v. NLRB, 5 Cir. 1962, 306 F.2d 569, 571. The Ninth Circuit has likewise adopted the broad view in a thorough opinion, the facts of which closely resemble the ones at bar. NLRB v. Western Wirebound Box Co., 9 Cir. 1966, 356 F.2d 88. See also NLRB v. Northwestern Publishing Co., 7 Cir. 1965, 343 F.2d 521, 525; J. I. Case Co. v. NLRB, 7 Cir. 1958, 253 F.2d 149, 152–153 (and cases cited therein). With full awareness that misuse of the disclosure privileges should not be permitted, United Furniture Workers of America, A.F.L.–C.I.O. v. NLRB, 4 Cir. 1967, 388 F.2d 880, we find no such misuse in the case at bar. The Board was entirely justified in finding that the company's refusal to furnish wage data violated Section 8(a) (5).

■ Turning to the second prong of the Board's finding, we find equally substantial evidence to support an 8(a) (5) violation in the company's inflexible position on wages during bargaining. The company attempts to absolve itself of bad faith inflexibility by pointing out that the union was not "unprepared intellectually to bargain" and that a contract was in fact negotiated. We fail to see how the union's preparedness would affect our consideration of the company's good faith. As to the second point, the negotiated contract, the com-

pany cites no authority but bolsters its argument by stating: "We submit that the matter became moot at that time [December 1, 1964, when the contract was signed]." In contrast, we quote from Judge Friendly in Siegel Co. v. NLRB, 2 Cir. 1965, 340 F.2d 309, 310:

"[W]hen the issue has been pressed throughout, the party unable to force the other to bargain or to include an agreed provision in the written contract does not 'waive' a completed refusal to bargain simply by signing up for the best it can get. It would seriously contravene the basic objective of industrial peace to place such a party in the predicament where it could make a valid charge of an unfair labor practice only if it forewent a contract altogether."

The latter expression reflects what has always been this Court's philosophy, see NLRB v. Item Co., supra, 220 F.2d at 958–959 (at [2]), and we readily adhere to it in the case at bar.[13]

(2) *Defeasance Clause—Termination of Bargaining.* In March, 1965, about 140 employees filed petitions with the Board to decertify the union. These were dismissed as being untimely be-

cause they were filed during an insulated period of bargaining. On March 31 the company notified the union that because the employees planned to refile a petition, any contract which they signed should provide for the possibility of an election and the termination of the contract should the union lose the election. During April the company's position became inflexible as to the defeasance clause, and it subsequently terminated negotiations entirely. The company does not deny these facts; it contends rather that it was permitted, perhaps even obligated, to halt bargaining because of the absence of a union majority.

The facts concerning the union's strength likewise cannot be disputed. On October 30, 1963, the union certainly had a majority because it won a representation election. Moreover, for approximately one year after the union's certification on January 21, 1964, a union majority was uncontestable at law (absent "special circumstances" which are not present here). Brooks v. NLRB, 1954, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125, 42 A.L.R.2d 1405, NLRB v. Gulfmont Hotel Co., 5 Cir. 1966, 362 F.2d 588, 589.[14] However, even the Board ad-

---

13. The company attempts to distinguish the *Siegel* case by stating: "[T]he refusal to bargain in the *Siegel* case was based on the fact that the employer's refusal prevented the Union from obtaining a contract. As pointed out above, the Union here did in fact obtain a contract with the Company." We suggest that the company has seriously misread the two written opinions in the *Siegel* litigation. As pointed out in both opinions, the refusal-to-bargain charge was based on the company's refusal to include in its 1961 contract with the union a wage provision to which it had orally agreed. But the 1961 contract *was* executed, as is expressly stated in the first appeal to the Second Circuit, Amalgamated Clothing Workers of America, A.F.L.–C.I.O. v. NLRB, 2 Cir. 1963, 324 F.2d 228. The Court in 1963 overruled the Board's finding that the contract actually executed was sufficient but then remanded the case to the Board for determinations of (1) waiver due to the union's signing of the 1961 contract and (2) mootness due to the execution of a 1963 contract which did not

contain any similar clause. Upon a determination by the Board that no waiver or mootness barriers existed, the Court in 1965 affirmed in the decision quoted above.

14. The *Gulfmont Hotel* case also stands as rebuttal to the company's argument that, through union membership lists, it proved de facto that the union had no majority as of November 1, 1963 (two days following the union's election victory). The company's exhibit traces union membership, but the more significant figure is the number of employees who desired the union to be their bargaining representative. "No one knows how many employees who favored the unions had decided not to authorize the company to deduct union dues or how many who favored the union bargaining were not even members of the unions. * * * The flaw with the respondent's reasoning here is that there is no necessary connection between the checkoff list and the number of union supporters." NLRB v. Gulfmont Hotel Co., supra, 362 F.2d at 591–592.

mitted that, as of March, 1965, the union had lost its majority support.

Combining the above facts with his previous refusal-to-bargain findings, the Trial Examiner concluded:

"Though I conclude and find from the evidence that the Union did not thereafter [after expiration of the contract term] represent an actual majority of employees, the General Counsel and the Union contend that Respondent may not rely upon the Union's loss of majority for such loss was directly attributable to Respondent's unfair labor practices. See for example, Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 687 [64 S.Ct. 830, 88 L. Ed. 1007], where the Court held as follows:

> The Petitioner cannot, as justification for its refusal to bargain with the Union, set up the defection of union members which it had induced by unfair labor practices even though the result was that the Union no longer had the support of a majority. It cannot thus, by its own action, disestablish the Union as a bargaining representative of the employees, previously designated as such of their own free will [citing cases]. Petitioner's refusal to bargain under those circumstances was but an aggravation of its unfair labor practices in destroying the majority support of the union, and was a violation of Section 8(a) (1) and (5) of the Act.

"I find those principles controlling here, for I conclude and find on the entire evidence that it was Respondent's refusal to bargain at all times on and after March 24, 1964, which in-

duced the defection of union members and resulted in the loss of the Union's majority."

The Trial Examiner's conclusion parallels quite closely the conclusion reached by our Court in an analogous case. In NLRB v. Movie Star, Inc., 5 Cir. 1966, 361 F.2d 346, we held as violative of Section 8(a) (5) a company's withdrawal of recognition from the union after the company itself had dissipated the union's strength through 8(a) (1) misconduct. We find the law of that case to be instructive:

> "This refusal [refusal to continue bargaining after the company filed a petition for an election] was found by both the Examiner and the Board to be a violation of Section 8(a) (5) of the Act, on the ground that the Union's loss of majority was attributable to the Respondent's unfair labor practices. * * *
>
> * * * * * *
>
> "It is well settled that an 'employer will not be permitted to dissipate the union's majority by a series of Section 8(a) (1) violations and then demand that an election be held' * * * [numerous cases cited]. The rationale behind this rule is that an employer should not be allowed 'to reap the benefits of its obstructive and unlawful acts.' N.L.R.B. v. Poultry Enterprises, Inc. [5 Cir.], 207 F.2d supra, [522] at 525.
>
> * * * * * *
>
> "The effect of Respondents' numerous Section 8(a) (1) violations was to transform a possible good-faith doubt of the Union's majority into a bad-faith virtual certainty." 361 F.2d at 351.[15]

---

15. The Trial Examiner in the case at bar quite astutely noted "an apparent conflict between—or at least of conflicting implications of—*Bernhard-Altmann,* supra, [International Ladies' Garment Workers' Union, A.F.L.-C.I.O. v. NLRB, 1961, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762, which held as violative of Sections 8(a) (1), 8(a) (2), and 8(b) (1) (A) of the Act the company's bargaining with a minority union even though the company had hon-

estly believed the union to represent a majority of employees] and Franks Brothers Company v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 [which recognized the validity of a bargaining order when the company had dissipated the union's majority by Section 8(a) (5) violations]." Nevertheless the Trial Examiner concluded, and we agree, that *Bernhard-Altmann* cannot be used to aid and abet maleficent employers who have instigated employee

We agree with the Board that the armor of employee discontent cannot be donned by the company at bar. The company's refusal to bargain on and after March 31, 1965, is then clearly supported by substantial evidence.

(3) *Conditions for Bargaining.* On May 24, 1965, the union instituted a strike. The following day union president Wetherington wired the company demanding a meeting for the purpose of negotiation. The company replied by wire on June 1 as follows: "When you call off the strike and pickets are removed we will give consideration to your request for a meeting." The strike ended on June 3. Though a meeting was held on June 7, no contract negotiations occurred.

"A strike does not in and of itself suspend the bargaining obligation, * * * [cases cited], which would encompass a willingness, not a refusal, to meet with the Union, * * * [cases cited]." NLRB v. J. H. Rutter-Rex Mfg. Co., 5 Cir. 1957, 245 F.2d 594, 596, quoted in part in NLRB v. Safway Steel Scaffolds Co. of Georgia, 5 Cir. 1967, 383 F.2d 273, 280, cert. den., 1968, 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150. The company does not dispute this principle and instead relies on the union's loss of majority to justify its actions. We have encountered that argument, supra, and have concluded that majoritarianism, standing alone is not an all-inclusive concept. The loss of union support cannot be an absolute insulator against bargaining. We must look to its begetting, and our prior resolution of that point obviates further discussion here.

(4) *The Board's Bargaining Order.* Our resolution of the loss of the majority question likewise makes unnecessary an extensive discourse on the Board's order to continue bargaining for nine months.[16] As early as 1944, the Supreme Court in enforcing a bargaining order, acknowledged that it was merely applying the principles of well-established law:

"Little need be added to what has been said on this subject in other cases. Out of its wide experience, the Board many times has expressed the view that the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions. The Board's study of this problem has led it to conclude that, for these reasons, a requirement that union membership be kept intact during delays incident to hearings would result in permitting employers to profit from their own wrongful refusal to bargain * * * [cases cited]. One of the chief responsibilities of the Board is to direct such action as will dissipate the unwholesome effects of violations of the Act. * * * [authority cited]. 'It is for the Board, not the courts, to determine how the effect of prior unfair labor practices may be expunged.'" Franks Bros. Co. v. NLRB, 1944, 321 U.S. 702, 704, 64 S.Ct. 817, 818, 88 L.Ed. 1020, 1022–1023.

That the principles espoused in *Franks Bros.* have withstood subsequent legislation is now patently clear. See expressly NLRB v. Geigy Co., 9 Cir. 1954, 211 F.2d 553, 558–559 (and cases cited therein), cert. den., 348 U.S. 821, 75 S.Ct. 33,

discontent through illegal means. The *Bernhard-Altmann—Franks Brothers* problem is but one of those encountered when we try to adjudicate fairly among three different, yet closely interrelated interests.

16. The nine-month bargaining period equals the period from April 7, 1964, (the date the Trial Examiner determined as the company's first unfair labor practice) until January 21, 1965, (one year after the union's formal certification) during which the company refused to bargain and had a duty to do so. As we have noted in footnote 4 supra, the Board might have been justified in initiating the company's 8(a) (5) violations with the unilateral wage increase on January 20, 1965. Certainly, in light of the evidence, the company cannot validly assert that the nine-month period is inequitable as to its own interests.

99 L.Ed. 647. See also, e. g., NLRB v. Goodyear Tire & Rubber Co. Retread Plant, 5 Cir. 1968, 394 F.2d 711; NLRB v. Luisi Truck Lines, 9 Cir. 1967, 384 F.2d 842, 847–848; NLRB v. Movie Star, Inc., supra, 361 F.2d at 351; Bilton Insulation, Inc. v. NLRB, 4 Cir. 1961, 297 F.2d 141, 144–145.

 As was recognized in *Franks Bros.*, as well as in other cases, see NLRB v. Riverside Mfg. Co., 5 Cir. 1941, 119 F.2d 302, 304–306, the order to bargain may sometimes be inconsistent with the wishes of the employees at the time. Nevertheless, the bargaining order must be allowed as a remedy on at least two grounds: (1) the refusal to let an employer benefit by his own wrongs and (2) the insistence that a union which has won the right to bargain is allowed to enjoy that right.[17] Based on these two rationales, our Circuit has enforced bargaining orders which, like the one at bar, extend the certification year. NLRB v. Commerce Co., 5 Cir. 1964, 328 F.2d 600 (six-month extension of the certification year), cert. den., 379 U.S. 817, 85 S.Ct. 32, 13 L.Ed.2d 28, followed in NLRB v. Burnett Construction Co., 10 Cir. 1965, 350 F.2d 57, 60 (seven-month extension of the certification year). See also NLRB v. Gebhardt-Vogel Tanning Co., 7 Cir. 1968, 389 F.2d 71, 75–76 (refusing to enforce a five-month extension of the certification year, but on evidentiary grounds). On the record before us, we find substantial evidence to support such an order here.

The company's additional assertion, that the language of the Board's order is too broad, is totally without merit. The order is therefore enforced, excepting that part of the order which is applicable to the company's anti-strike campaign in April, 1964, and to the company's delay in reinstating two employees after the May-June, 1965, strike.

Enforced in part. Denied in part.

---

17. For the importance of this second rationale, see Sakrete of Northern California, Inc. v. NLRB, 9 Cir. 1964, 332 F.2d 902, 908–910, cert. den., 1965, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556, which sanctifies expressly what many other cases allow sub silentio—that a bargaining order may be appropriate even in the absence of proof that the union's loss of majority was attributable to the unfair labor practices which had been perpetrated by the company.